ASHLEY STEPHENSON, INDIVIDUALLY, AND AS A RESIDENT AND REGISTERED VOTER OF
    BEAUFORT COUNTY, NORTH CAROLINA; LEO DAUGHTRY, INDIVIDUALLY, AND AS
    REPRESENTATIVE FOR THE 95TH DISTRICT, NORTH CAROLINA HOUSE OF REPRESENTATIVES;
    PATRICK BALLANTINE, INDIVIDUALLY, AND AS SENATOR FOR THE 4TH DISTRICT, NORTH
    CAROLINA SENATE; ART POPE, INDIVIDUALLY, AND AS REPRESENTATIVE FOR THE 61ST
    DISTRICT, NORTH CAROLINA HOUSE OF REPRESENTATIVES; AND BILL COBEY, INDIVIDU-
    ALLY, AND AS CHAIRMAN OF THE NORTH CAROLINA REPUBLICAN PARTY AND ON BEHALF OF
    THEMSELVES AND ALL OTHER PERSONS SIMILARLY SITUATED V. GARY BARTLETT, AS
    EXECUTIVE DIRECTOR OF THE STATE BOARD OF ELECTIONS; LARRY LEAKE, ROBERT
    B. CORDLE, GENEVIEVE C. SIMS, LORRAINE G. SHINN, AND CHARLES
    WINFREE, AS MEMBERS OF THE STATE BOARD OF ELECTIONS; JAMES B. BLACK, AS
    SPEAKER OF THE NORTH CAROLINA HOUSE OF REPRESENTATIVES; MARC BASNIGHT, AS
    PRESIDENT PRO TEMPORE OF THE NORTH CAROLINA SENATE; MICHAEL EASLEY, AS
    GOVERNOR OF THE STATE OF NORTH CAROLINA; AND ROY COOPER, AS ATTORNEY
    GENERAL OF THE STATE OF NORTH CAROLINA

No. 94PA02

(Filed 30 April 2002)

## 1. Elections— North Carolina—2001 legislative redistricting plans—constitutionality

The trial court did not err by granting summary judgment in favor of plaintiffs on the claim that the General Assembly enacted its 2001 legislative redistricting plans in violation of the whole county provision (WCP) under Article II, Sections 3(3) and 5(3) of the North Carolina Constitution when the 2001 Senate redistricting plan divided 51 of 100 counties into different Senate districts and the 2001 House redistricting plan divided 70 out of 100 counties into different House districts, because the use of both single-member and multi-member districts within the same redistricting plan violates the Equal Protection Clause of the State Constitution unless it is established that inclusion of multi-member districts advances a compelling state interest, and the trial court is directed to conduct a hearing, on an expedited basis, on: (1) the question of the feasibility of allowing the General Assembly the first opportunity to develop new redis-tricting plans consistent with the legal requirements set forth by the North Carolina Supreme Court if so doing will not disrupt the timing of the 2002 general election; and (2) in the event defendants are unable to develop new redistricting plans in accordance with the timetable established by the trial court, the trial court is authorized and directed to seek proposed remedial plans, review and adopt temporary or interim remedial plans for the North Carolina Senate and North Carolina House of

STEPHENSON v. BARTLETT

[355 N.C. 354 (2002)]

Representatives, and seek preclearance thereof, for use in the 2002 election cycle.

**2. Elections— North Carolina—2001 legislative redistricting plans—instructions on remand**

The trial court, during the remedial stage of the instant proceeding seeking to correct the General Assembly's unconstitutional enactment of its 2001 legislative redistricting plans in violation of the whole county provisions (WCP) under Article II, Sections 3(3) and 5(3) of the North Carolina Constitution, is instructed on remand to comply with the following requirements including: (1) to ensure full compliance with federal law, legislative districts required by the Voting Rights Act of 1965 (VRA) shall be formed prior to creation of non-VRA districts; (2) VRA districts must be formed consistent with federal law and in a manner having no retrogressive effect upon minority voters; and (3) to the maximum extent practicable, such VRA districts shall also comply with the legal requirements of the WCP herein established for all redistricting plans and districts throughout the State.

**3. Elections— North Carolina—legislative redistricting plans—general rules**

The following general rules shall be used for all redistricting plans and districts throughout North Carolina, including: (1) in forming new legislative districts, any deviation from the ideal population for a legislative district shall be at or within plus or minus five percent for purposes of compliance with federal "one-person, one-vote" requirements; (2) in counties having a 2000 census population sufficient to support the formation of one non-Voting Rights Act of 1965 (VRA) legislative district falling at or within plus or minus five percent deviation from the ideal population consistent with "one-person, one-vote" requirements, the whole county provision (WCP) requires that the physical boundaries of any such non-VRA legislative district not cross or traverse the exterior geographic line of any such county; (3) when two or more non-VRA legislative districts may be created within a single county, which districts fall at or within plus or minor five percent deviation from the ideal population consistent with "one-person, one-vote" requirements, single member non-VRA districts shall be formed within said county, and such non-VRA districts shall be compact and shall not traverse the exterior geographic boundary of any such county; (4) in counties having a non-VRA

population pool which cannot support at least one legislative district at or within plus or minus five percent of the ideal population for a legislative district or, alternatively, counties having a non-VRA population pool which, if divided into districts, would not comply with the at or within plus or minus five percent "one-person, one-vote" standard, the requirements of the WCP are met by combining or grouping the minimum number of whole, contiguous counties necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard; (5) within any such contiguous multi-county grouping, compact districts shall be formed, consistent with the at or within plus or minus five percent standard, whose boundary lines do not cross or traverse the "exterior" line of the multi-county grouping; provided, however, that the resulting interior county lines created by any such groupings may be crossed or traversed in the creation of districts within said multi-county grouping but only to the extent necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard; (6) intent underlying the WCP must be enforced to the maximum extent possible; thus, only the smallest number of counties necessary to comply with the at or within plus or minus five percent "one-person, one-vote"· standard shall be combined, and communities of interest should be considered in the formation of compact and contiguous electoral districts; and (7) any new redistricting plans, including any proposed on remand in this case, shall depart from strict compliance with the legal requirements set forth herein only to the extent necessary to comply with federal law.

Justice ORR concurring in part and dissenting in part.

Justice PARKER dissenting.

Justice BUTTERFIELD dissenting.

On appeal pursuant to N.C.G.S. § 7A-31(b) prior to determination by the Court of Appeals from an order allowing summary judgment for plaintiffs and an order for declaratory judgment and injunctive relief holding that the 2001 State legislative redistricting plans violate the North Carolina Constitution, both orders entered 20 February 2002 by Jenkins, J., in Superior Court, Johnston County. Heard in Special Session in the Supreme Court 4 April 2002.

*Maupin Taylor & Ellis, P.A., by Thomas A. Farr and James C. Dever, III, for plaintiff-appellees.*

## STEPHENSON v. BARTLETT

[355 N.C. 354 (2002)]

*Roy Cooper, Attorney General, by Edwin M. Speas, Jr., Chief Deputy Attorney General, and Tiare B. Smiley, Norma S. Harrell, Alexander McC. Peters, and Susan K. Nichols, Special Deputy Attorneys General, for defendant-appellants; and Jenner & Block, LLC, by Donald B. Verrilli, Jr., pro hac vice, co-counsel for defendant-appellants Marc Basnight and James B. Black.*

*Patterson, Harkavy & Lawrence, L.L.P., by Burton Craige; and Neill S. Fuleihan, on behalf of the North Carolina Academy of Trial Lawyers, amicus curiae.*

*Ferguson Stein Chambers Wallas Adkins Gresham & Sumter PA, by Adam Stein and Julius L. Chambers, on behalf of the North Carolina State Conference of Branches of the National Association for the Advancement of Colored People, amicus curiae.*

*Smith Moore LLP, by James G. Exum, Jr., and Julia F. Youngman, on behalf of Wilbur Gulley, individually and as Senator for the 13th District, N.C. Senate; Luther Jordan, individually and as Senator for the 7th District, N.C. Senate, and as Chairman of the Legislative Black Caucus; David Weinstein, individually and as Senator for the 30th District, N.C. Senate, and as Co-Chairman of the Senate Rural Development Committee; Edd Nye, individually and as Representative for the 96th District, N.C. House of Representatives; and Victor Farah, individually and as resident and registered voter of Wake County, and as candidate for the N.C. House of Representatives, and on behalf of themselves, their constituents, and all other persons similarly situated, amici curiae.*

*Everett and Everett, by Robinson O. Everett and Seth A. Neyhart, on behalf of Americans for the Defense of Constitutional Rights, Inc., amicus curiae.*

*Hunter, Elam, Benjamin & Tomlin, PLLC, by Robert N. Hunter, Jr., on behalf of Lee McLean Foreman, Marcus D. Kindley, William W. Peaslee, Kenneth Ray Moore, Robert Brewington, William Franklin Mitchell, Kellon D. McMillian, Cecelia Ferguson Taylor, Gilbert Parker, and Henry McKoy, amici curiae.*

*Collier Shannon Scott, PLLC, by Scott A. Sinder, pro hac vice; and Coats & Bennett, PLLC, by Anthony Biller, on behalf of the DKT Liberty Project and the Center for Voting and Democracy, amici curiae.*

*Pender County, by Carl W. Thurman III, Pender County Attorney, amicus curiae.*

LAKE, Chief Justice.

The instant action presents a state law question of first impression for this Court. The case arises from a challenge to the state legislative redistricting plans adopted by the General Assembly in November 2001, upon the basis that these plans violate provisions of the North Carolina Constitution (the State Constitution).[1]

Plaintiffs, citizens and registered voters in North Carolina, filed suit on 13 November 2001 contending that, under Article II, Sections 3(3) and 5(3) of the State Constitution, collectively referred to as the "Whole-County Provisions" (the WCP), the General Assembly may not divide counties in creating Senate and House of Representative districts except to the extent necessary to comply with federal law.

On 19 November 2001, defendants removed this case to the United States District Court for the Eastern District of North Carolina. On 20 December 2001, the District Court remanded the case. *Stephenson v. Bartlett*, 180 F. Supp. 2d 779 (E.D.N.C. 2001). In its order of remand, the District Court stated, among other things, that the redistricting process was a matter primarily within the province of the states, that plaintiffs had challenged the 2001 legislative redistricting plans solely on the basis of state constitutional provisions, that the complaint "only raises issues of state law," and that defendants' removal of this suit from state court was therefore inappropriate. *Id.* at 782-83, 786. Defendants subsequently filed a notice of appeal from the District Court's order with the United States Court of Appeals for the Fourth Circuit. The Fourth Circuit denied defendants' motion to stay the District Court's order of remand.

On 20 February 2002, the trial court granted plaintiffs' motion for summary judgment on the ground that the 2001 legislative redistrict-

---

1. The Senate redistricting plan, known as Senate Plan 1C, was ratified on 13 November 2001. The House redistricting plan, known as the Sutton House Plan 3, was also ratified on 13 November 2001. We hereinafter refer to the redistricting plans collectively as the "2001 legislative redistricting plans."

ing plans violate the State Constitution. That same day, the trial court entered a remedial order granting both declaratory and injunctive relief pursuant to Rules 57 and 65 of the North Carolina Rules of Civil Procedure. The order of the trial court provided in pertinent part:

1. Article I, Section 3 of the North Carolina Constitution provides that every right under North Carolina law "should be exercised in pursuance of laws and consistently with the Constitution of the United States." Article I, Section 5 provides that "no law or ordinance of the State in contravention or subversion" of the United States Constitution "can have any lasting force and effect." . . . [T]he Court concludes that Article I, Sections 2, 3, and 5, require that the North Carolina Constitution should be harmonized with any applicable provisions of federal law, so as to avoid any conflict between the North Carolina Constitution and federal law.

2. Under a harmonized interpretation of Article I, Sections 2, 3, and 5 and Article II, Sections 3(3) and 5(3), the North Carolina Constitution prohibits the General Assembly from dividing counties into separate Senate and House districts, except to the extent that counties must be divided to comply with federal law. Thus, the General Assembly must preserve county lines to the maximum extent possible, except to the extent counties must be divided to comply with Section 5 of the Voting Rights Act, to comply with Section 2 of the Voting Rights Act, and to comply with the U.S. Constitution, including the federal one-person one-vote requirements . . . .

3. The [2001 legislative redistricting plans] divide counties more than are necessary to comply with the Voting Rights Act or the federal one-person one-vote requirements, and therefore violate the North Carolina Constitution.

The trial court permanently enjoined defendants "from conducting any primary or general election under the 1992 Senate and House Plans, the [2001 legislative redistricting plans], or any other plans that divide counties for any reason other than: (a) the creation of districts needed to obtain preclearance under Section 5 of the Voting Rights Act; (b) the creation of districts needed to avoid liability under Section 2 of the Voting Rights Act; (c) maintaining the population deviation range between districts within the limits approved [by the United States Supreme Court] for jurisdictions that prohibit the division of counties into separate legislative districts; and (d) any other

divisions that are necessary to comply with the United State[s] Constitution and applicable federal law." Finally, the trial court stayed its order and provided that, in fairness to all parties, the voters, and the taxpayers, the present constitutional issues and the outcome of plaintiffs' request for injunctive relief for the 2002 election cycle should be decided by this Court.

On 26 February 2002, this Court allowed plaintiffs' "Emergency Petition for Suspension of the North Carolina Rules of Appellate Procedure," thus setting the stage for expedited direct review by this Court. Thereafter, defendants filed notice of appeal in this Court. By unanimous order dated 7 March 2002, this Court enjoined defendants from conducting primary elections on 7 May 2002 for the office of Senator in the North Carolina Senate and the office of Representative in the North Carolina House of Representatives, pending determination of the constitutional issue by this Court.

On 21 March 2000, the United States Census Bureau released the 2000 population data for the State of North Carolina. From 1990 to 2000, the state's population increased by 21.4 percent, to 8,049,313. Pursuant to its constitutional mandate to redistrict and reapportion legislative districts after each decennial census, N.C. Const. art. II, §§ 3, 5, on 13 November 2001, the General Assembly enacted redistricting and reapportionment plans for the Senate and the House of Representatives, Acts of Nov. 13, 2001, chs. 458, 459, 2001 N.C. Sess. Laws ——, ——. The 2001 Senate Plan divides 51 of 100 counties into different districts (2001 Senate map, Attachment A). Ch. 458, 2001 N.C. Sess. Laws ——. The 2001 House Plan divides 70 of 100 counties into different districts (2001 House map, Attachment B). Ch. 459, 2001 N.C. Sess. Laws ——. Under the 2001 Senate Plan, a number of counties are divided into as many as four to six districts, and under the 2001 House Plan, a number of counties are divided into as many as four to thirteen districts. Chs. 458, 459, 2001 N.C. Sess. Laws ——, ——.

For instance, Pender County has a 2000 census population of 41,082, a number far below the ideal population for a single-member House seat of 67,078. In its *amicus curiae* brief, Pender County states that it "has no interest in which political party controls the North Carolina General Assembly or the re-election prospects of a particular legislator." Rather, "Pender County simply wants its citizens to have the opportunity to present a cohesive voice to address the particular needs it faces as a low wealth, rapid growth county." Under the 2001 legislative redistricting plans, the citizens of Pender

**STEPHENSON v. BARTLETT**

[355 N.C. 354 (2002)]

County are distributed among eight legislative districts incorporating fourteen different counties. Chs. 458, 459, 2001 N.C. Sess. Laws ——, ——. As a result, Pender County maintains that the 2001 legislative redistricting plans have "balkanized" the county and muted the voices of its citizens seeking to choose "a" legislator who will be sensitive and responsive to their unique needs.

In the trial court below, plaintiffs presented a forecast of their evidence on the issue of protecting the citizenry's equal right to vote and ensuring the continued vitality of the State's democratic processes. In this regard, plaintiffs submitted deposition testimony of John N. Davis, Executive Director of NCFREE, a nonpartisan organization within this State, who has been forecasting election results in North Carolina since 1992. In 2000, Davis correctly projected 193 out of 200 North Carolina elections. According to Davis, the number of Senate seats competitive for both major political parties has dropped from 14 out of 50 under the 1992 Senate Plan to only 6 out of 50 under the 2001 Senate Plan. Similarly, Davis asserts that the number of competitive House seats has dropped from 32 out of 120 under the 1992 House Plan to only 14 out of 120 under the 2001 House Plan.

The original filing period for legislative offices for the November 2002 elections closed on 1 March 2002. The registration of those who filed for legislative offices for these elections reflects that in the Senate, under the 2001 legislative redistricting plans, 30 out of 50, or sixty percent, of the seats will be uncontested in the November 2002 general election. In the House, 71 out of 120 House seats, or fifty-nine percent, will be uncontested in the November 2002 general election. Overall, out of 170 seats in the General Assembly, 101 members, or fifty-nine percent, will not face opposition in the 2002 general election. Stated differently, voters within districts represented by these 101 members will apparently have no meaningful electoral choices in the 2002 election cycle under the 2001 legislative redistricting plans.

## STATE CONSTITUTIONAL ANALYSIS

[1] The primary question for our review is whether the General Assembly, in enacting the 2001 legislative redistricting plans, violated the WCP of the State Constitution. Defendants contend that the constitutional provisions mandating that counties not be divided are wholly unenforceable because of the requirements of the Voting Rights Act. Plaintiffs, on the other hand, assert that the State Constitution requires that counties not be divided when creating

state legislative apportionment plans except to the extent required by federal law.

### The State Role in Legislative Redistricting

The apportionment of legislative districts is a matter primarily reserved to the respective states. *Growe v. Emison*, 507 U.S. 25, 34, 122 L. Ed. 2d 388, 400 (1993) (stating that "the Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts"); *see also Chapman v. Meier*, 420 U.S. 1, 27, 42 L. Ed. 2d 766, 785 (1975); *Reynolds v. Sims*, 377 U.S. 533, 586, 12 L. Ed. 2d 506, 541 (1964). Moreover, "issues concerning the proper construction and application of . . . the Constitution of North Carolina can . . . be answered with finality [only] by this Court." *State ex rel. Martin v. Preston*, 325 N.C. 438, 449, 385 S.E.2d 473, 479 (1989); *see also PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 81, 64 L. Ed. 2d 741, 752 (1980); *Murdock v. Mayor of Memphis*, 87 U.S. 590, 626, 22 L. Ed. 429, 441 (1874); *State v. Arrington*, 311 N.C. 633, 643, 319 S.E.2d 254, 260 (1984). Although there is a strong presumption that acts of the General Assembly are constitutional, it is nevertheless the duty of this Court, in some instances, to declare such acts unconstitutional. *Preston*, 325 N.C. at 448-49, 385 S.E.2d at 478; *see also Marbury v. Madison*, 5 U.S. 137, 177, 2 L. Ed. 60, 73 (1803) (stating that "[i]t is emphatically the province and duty of the judicial department to say what the law is"); *Bayard v. Singleton*, 1 N.C. 5, 6-7 (1787). Indeed, within the context of state redistricting and reapportionment disputes, it is well within the "power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan." *Scott v. Germano*, 381 U.S. 407, 409, 14 L. Ed. 2d 477, 478 (1965) (per curiam).

The State Constitution provides that "[t]he General Assembly, at the first regular session convening after the return of every decennial census of population taken by order of Congress, shall revise the senate districts and the apportionment of Senators among those districts" and "shall revise the representative districts and the apportionment of Representatives among those districts." N.C. Const. art. II, §§ 3, 5. The State Constitution specifically enumerates four limitations upon the redistricting and reapportionment authority of the General Assembly, summarized as follows:

(1) Each Senator and Representative shall represent, as nearly as possible, an equal number of inhabitants.

(2) Each senate and representative district shall at all times consist of contiguous territory.

(3) No county shall be divided in the formation of a senate or representative district.

(4) Once established, the senate and representative districts and the apportionment of Senators and Representatives shall remain unaltered until the next decennial census of population taken by order of Congress.

*See* N.C. Const. art. II, §§ 3, 5. The WCP, the third limitation above, provides that "[n]o county shall be divided in the formation of a senate district," N.C. Const. art. II, § 3(3), and that "[n]o county shall be divided in the formation of a representative district," N.C. Const. art. II, § 5(3).

## The Federal Role in Legislative Redistricting

Although the respective state legislatures maintain primary responsibility for redistricting and reapportionment of legislative districts, such procedures must comport with federal law. Interpretation of the federal limitations upon the redistricting process is unnecessary to the resolution of the instant case. Nonetheless, as these requirements necessarily serve as limitations upon the state legislative redistricting process, we find it helpful to describe, at least briefly, the federal law in this area. The applicable provisions include (1) "one-person, one-vote" principles requiring some measure of population equality between state legislative districts as articulated in *Baker v. Carr*, 369 U.S. 186, 7 L. Ed. 2d 663 (1962), and *Reynolds v. Sims*, 377 U.S. 533, 12 L. Ed. 2d 506, and their progeny; and (2) the Voting Rights Act of 1965 (the VRA), as amended, to protect against voting discrimination, as proscribed under the Fifteenth Amendment, 42 U.S.C. §§ 1973-1973p (1994); *Lopez v. Monterey Cty.*, 525 U.S. 266, 269, 142 L. Ed. 2d 728, 734 (1999).

Section 2 of the VRA generally provides that states or their political subdivisions may not impose any voting qualification or prerequisite that impairs or dilutes, on account of race or color, a citizen's opportunity to participate in the political process and to elect representatives of his or her choice. 42 U.S.C. §§ 1973a, 1973b; *Thornburg v. Gingles*, 478 U.S. 30, 43, 92 L. Ed. 2d 25, 42 (1986). The primary purpose underlying section 5 of the VRA is to avoid retrogression, i.e., a change in voting procedures which would place the members of a racial or language minority group in a less favorable position than

STEPHENSON v. BARTLETT

[355 N.C. 354 (2002)]

they had occupied before the change with respect to the opportunity to vote effectively. 28 C.F.R. § 51.54(a) (2001); *see also Beer v. United States*, 425 U.S. 130, 140-42, 47 L. Ed. 2d 629, 638-40 (1976). To effectuate its remedial objectives, the VRA requires jurisdictions "covered" by section 5 that seek to enact or administer any change in a voting standard, practice, or procedure to submit the proposed change to the United States Department of Justice (USDOJ) for preclearance or, alternatively, to obtain a declaratory ruling from the United States District Court for the District of Columbia. 42 U.S.C. § 1973c; *see also Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 323, 145 L. Ed. 2d 845, 853 (2000).

The State of North Carolina is not a covered jurisdiction for section 5 purposes. *See Lopez*, 525 U.S. at 280, 142 L. Ed. 2d at 741 (noting that "seven states . . . are currently partially covered: California, Florida, Michigan, New Hampshire, New York, North Carolina, and South Dakota"). Forty of this State's one hundred counties, however, are covered jurisdictions and are subject to section 5 requirements. *See* 42 U.S.C. § 1973c; 28 C.F.R. § 51.4(c) & app. to pt. 51, at 96-98 (2001); *Shaw v. Reno*, 509 U.S. 630, 634, 125 L. Ed. 2d 511, 520 (1993). When the State enacts voting changes that affect these counties, the changes must be precleared before they are administered. *See Lopez*, 525 U.S. at 280, 142 L. Ed. 2d at 740-41 (stating that *United Jewish Orgs. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 51 L. Ed. 2d 229 (1977), and *Shaw v. Hunt*, 517 U.S. 899, 135 L. Ed. 2d 207 (1996), "reveal a clear assumption by this Court that [section] 5 preclearance is required where a noncovered State effects voting changes in covered counties"). The VRA does not command a state to adopt any particular legislative reapportionment plan, but rather prevents the enforcement of redistricting plans having the purpose or effect of diluting the voting strength of legally protected minority groups.

The Historical Role of Counties in Legislative Redistricting

Before we begin our analysis, we briefly review the importance of counties as political subdivisions of the State of North Carolina. Counties are creatures of the General Assembly and serve as agents and instrumentalities of State government. *High Point Surplus Co. v. Pleasants*, 264 N.C. 650, 654, 142 S.E.2d 697, 701 (1965); *DeLoatch v. Beamon*, 252 N.C. 754, 757, 114 S.E.2d 711, 714 (1960). Counties are subject to almost unlimited legislative control, except to the extent set out in the State Constitution. *Martin v. Board of Comm'rs of Wake Cty.*, 208 N.C. 354, 365, 180 S.E. 777, 783 (1935). "[T]he powers

and functions of a county bear reference to the general policy of the State, and are in fact an integral portion of the general administration of State policy." *O'Berry v. Mecklenburg Cty.*, 198 N.C. 357, 360, 151 S.E. 880, 882 (1930), *quoted in Martin*, 208 N.C. at 365, 180 S.E. at 783.

Counties serve as the State's agents in administering state-wide programs, while also functioning as local governments that devise rules and provide essential services to their citizens. This Court has long recognized the importance of the county to our system of government:

> The counties of this state . . . are . . . organized for political and civil purposes. . . . The leading and principal purpose in establishing them is[] to effectuate the political organization and civil administration of the state, in respect to its general purposes and policy which require local direction, supervision and control, such as matters of local finance, education, provisions for the poor, . . . and in large measure, the administration of public justice. It is through them, mainly, that the powers of government reach and operate directly upon the people, and the people direct and control the government. They are indeed a necessary part and parcel of the subordinate instrumentalities employed in carrying out the general policy of the state in the administration of government. They constitute a distinguishing feature in our free system of government. It is through them, in large degree, that the people enjoy the benefits arising from local self-government, and foster and perpetuate that spirit of independence and love of liberty that withers and dies under the baneful influence of centralized systems of government.

*White v. Commissioners of Chowan Cty.*, 90 N.C. 437, 438 (1884); *see also Southern Ry. Co. v. Mecklenburg Cty.*, 231 N.C. 148, 150-51, 56 S.E.2d 438, 439-40 (1949).

Counties play a vital role in many areas touching the everyday lives of North Carolinians. For example, each county effects the administration of justice within its borders, and each has a jail and a courthouse where cases arising in the county are usually tried. A. Fleming Bell, II, & Warren Jake Wicker, *County Government in North Carolina* 938-39, 943 (4th ed. 1998). Each county elects a sheriff. *Id.* at 930. Soil and water conservation districts oversee watershed programs and drainage issues in almost every county. *Id.* at 682-83. Each county is responsible for administering the public schools by

way of a county board of education. *Id.* at 823-29. Not surprisingly, people identify themselves as residents of their counties and customarily interact most frequently with their government at the county level. *See generally id.* at vii-xi. Based on the clear identity and common interests that counties provide, the impetus for the preservation of county lines, as reflected within the WCP, is easily understood within the redistricting context.

There is a long-standing tradition of respecting county lines during the redistricting process in this State. Indeed, this custom and practice arose hundreds of years before federal limitations were placed upon state redistricting and reapportionment procedures during the 1960s. North Carolina's initial state constitution, enacted in 1776, provided that representation in both the Senate and the House of Commons was based on "counties." *See* John V. Orth, *The North Carolina State Constitution: A Reference Guide* 81 (1993) [hereinafter Orth, *State Constitution*]. In the enactment of amendments in 1835, the General Assembly provided that "counties" were not to be divided between two or more senate districts and that each "county" was to be guaranteed at least one representative. *See id.* The 1868 Constitution provided that "no County shall be divided in the formation of a Senate District," unless entitled to two or more Senators, and further provided the House of Representatives shall be composed of 120 members "to be elected by the Counties respectively, according to their population," with each county to have at least one Representative. N.C. Const. of 1868, art. II, §§ 5, 6 (amended 1968).

## The Development of a Modern Redistricting Jurisprudence

In *Drum v. Seawell,* 249 F. Supp. 877 (M.D.N.C. 1965), *aff'd per curiam,* 383 U.S. 831, 16 L. Ed. 2d 298 (1966), a three-judge panel on the United States District Court for the Middle District of North Carolina ruled that the General Assembly's legislative redistricting plans violated the "one-person, one-vote" requirement of the United States Constitution and were therefore void. The District Court enjoined the State from using the unconstitutional plans in the 1966 election cycle. *Id.* at 881. The General Assembly thereafter enacted revised redistricting plans in compliance with the District Court's mandate but did not divide counties into separate legislative districts. On 18 February 1966, the District Court found the revised plans to be constitutional. *Drum v. Seawell,* 250 F. Supp. 922, 924 n.2 (M.D.N.C. 1966). The revised legislative districts were thereafter used in the 1966, 1968, and 1970 elections.

STEPHENSON v. BARTLETT

[355 N.C. 354 (2002)]

Following the *Drum* decisions, the General Assembly proposed constitutional amendments in 1967 to the State Constitution's redistricting and reapportionment provisions. *See* Act of May 31, 1967, ch. 640, 1967 N.C. Sess. Laws 704. The proposed amendments for the Senate and House of Representatives reincorporated a prohibition against the division of counties. *Id.* Subsequently, the North Carolina State Constitution Study Commission completed a comprehensive review and revision of the State Constitution. *See* Orth, *State Constitution* at 20. In November 1968, the voters of North Carolina approved the amendments to the redistricting and reapportionment provisions in the 1868 State Constitution. *See* John L. Sanders & John F. Lomax, Jr., *Amendments to the Constitution of North Carolina: 1776-1996*, at 15 (Inst. of Gov't, Univ. of N.C. at Chapel Hill, 1997). These 1968 amendments based representation in both the Senate and House of Representatives upon the requirement of "one-person, one-vote." *See* Orth, *State Constitution* at 81. These amendments also required the preservation of county lines when forming districts. *See id.* In 1969, the General Assembly reviewed and approved the proposed revisions of the State Constitution, Act of July 2, 1969, ch. 1258, 1969 N.C. Sess. Laws 1461, and in November 1970, North Carolina voters ratified a revised and amended state constitution known as the 1971 Constitution, *see* John L. Sanders, *Our Constitutions: An Historical Perspective, in* Elaine F. Marshall, N.C. Dep't of Sec'y of State, *North Carolina Manual 1999-2000*, 125, at 134. As University of North Carolina Law Professor John Orth, a highly respected state constitutional scholar, noted, "The 1971 Constitution, the state's third, was not . . . a product of haste and social turmoil. It was instead a good government-measure, long matured and carefully crafted by the state's lawyers and politicians, designed to consolidate and conserve the best features of the past, not to break with it." Orth, *State Constitution* at 20. The 1971 Constitution included grammatical changes to the 1968 amendments to the Constitution with respect to redistricting and reapportionment, but preserved the language prohibiting the division of counties. N.C. Const. art. II, §§ 3, 5.

Consistent with the 1971 Constitution, the General Assembly enacted a redistricting plan in 1971 that did not divide counties into separate legislative districts. Act of June 1, 1971, ch. 483, 1971 N.C. Sess. Laws 412; Act of July 21, 1971, ch. 1177, 1971 N.C. Sess. Laws 1743. The USDOJ precleared the 1971 legislative reapportionment plans, and those plans were used in the 1972 through 1980 elections.

STEPHENSON v. BARTLETT

[355 N.C. 354 (2002)]

In 1981, the General Assembly again enacted redistricting plans for the Senate and House of Representatives which did not divide counties. Act of July 3, 1981, ch. 821, 1981 N.C. Sess. Laws 1191; Act of October 30, 1981, ch. 1130, 1981 N.C. Sess. Laws 1657. The USDOJ refused to preclear the 1981 legislative redistricting plans, however, because they contained no majority-minority single-member districts and submerged cognizable minority populations within large multi-member districts. For these reasons, the USDOJ interposed an objection to the use of a "whole-county" criterion by North Carolina, as applied within the plan as then submitted, insofar as it affected the forty counties in North Carolina covered by section 5 of the VRA. The USDOJ made clear, however, that its response to the plans submitted by North Carolina at that time did *not* preclude the State from preserving county lines whenever feasible in formulating its new districts.

In response to the USDOJ's administrative determination, the General Assembly convened in April 1982 and enacted a revised redistricting plan for the House, creating four African-American single-member districts and one African-American two-member district. The House Plan divided twenty-four counties. Act of February 11, 1982, ch. 4, 1981 N.C. Sess. Laws (1st Extra Sess. 1982) 6; Act of April 27, 1982, ch. 1, 1981 N.C. Sess. Laws (2d Extra Sess. 1982) 15. On 30 April 1982, the USDOJ precleared the House redistricting plan. Similarly, the General Assembly enacted a revised redistricting plan for the Senate, which the USDOJ also precleared, that divided eight counties and created two African-American single-member districts. Act of April 27, 1982, ch. 2, 1981 N.C. Sess. Laws (2d Extra Sess. 1982) 15.

In *Cavanagh v. Brock*, 577 F. Supp. 176 (E.D.N.C. 1983), a case originally filed in state court, the defendants removed the case to federal court and affirmatively advocated the invalidation of the WCP. The District Court in *Cavanagh*, purporting to apply a state law severability analysis, determined that the USDOJ's objection to enforcement of the WCP as to the forty covered North Carolina counties also precluded its enforcement in the sixty noncovered counties.[2] *Id.* at 181.

---

2. The District Court in *Cavanagh* recognized that only a state challenge was asserted and struggled to determine whether abstention would be "most suitably effectuated by allowing defendants to seek a declaratory judgment in state court on that narrow issue." 577 F. Supp. at 180-81 n.4. The Court, however, ultimately concluded that abstention was inappropriate "in view of the substantial public interest in early resolution of challenges affecting the fundamental electoral processes involved" and

## The WCP and the 2001 Legislative Redistricting Plans

The expanded question before this Court, in light of the VRA, is whether the WCP is now entirely unenforceable, as defendants contend, or, alternatively, whether the WCP remains enforceable throughout the State to the extent not preempted or otherwise superseded by federal law.

When federal law preempts state law under the Supremacy Clause, it renders the state law invalid and without effect. U.S. Const. art. VI, cl. 2 ("This constitution, and the laws of the United States which shall be made in pursuance thereof, . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding."); *see also Pearson v. C.P. Buckner Steel Erection Co.*, 348 N.C. 239, 244, 498 S.E.2d 818, 821 (1998).

The primary inquiry in determining whether a state provision is preempted by federal law is to ascertain the intent of Congress. *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280, 93 L. Ed. 2d 613, 623 (1987) (noting that "federal law may supersede state law in several different ways"). Congress may state an intention to preempt state law in express terms, *id.*, or congressional intent to preempt may be inferred where a comprehensive federal scheme is imposed on an area occupied by state law, leaving state law "no room" in which to continue operating, *id.* at 281, 93 L. Ed. 2d at 623. As a third alternative, "in those areas where Congress has not completely displaced state regulation, federal law may nonetheless preempt state law to the extent it actually conflicts with federal law." *Id.* (emphasis added). "The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field . . . ." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 10 L. Ed. 2d 248, 256-57 (1963) (noting that where federal and state law both operate, a "coexistence" is formed). Because Congress has not preempted the entire field of state legislative redistricting and reapportionment, state provisions in this area of law not otherwise superseded by federal law must be accorded full force and effect. *See Growe*, 507 U.S. at 34, 122 L. Ed. 2d at 400; *see also Chapman*, 420 U.S. at 27, 42 L. Ed. 2d at 785; *Reynolds*, 377 U.S. at 586, 12 L. Ed. 2d at 541.

---

the apparent perception that its application of state law was "not sufficiently uncertain." *Id.*

The State Constitution similarly delineates the interplay between federal and state law: "The people of this State have the inherent, sole, and exclusive right of regulating the internal government and police thereof, . . . but every such right shall be exercised in pursuance of law and consistently with the Constitution of the United States." N.C. Const. art. I, § 3. "[N]o law or ordinance of the State in contravention or subversion [of the United States Constitution and government of the United States] can have any binding force." N.C. Const. art. I, § 5.

The people of North Carolina chose to place several explicit limitations upon the General Assembly's execution of the legislative reapportionment process. None of these express limitations, including the WCP, are facially inconsistent with the VRA or other federal law. Thus, the State retains significant discretion when formulating legislative districts, so long as the "effect" of districts created pursuant to a "whole-county" criterion or other constitutional requirement does not dilute minority voting strength in violation of federal law.

"Issues concerning the proper construction of the Constitution of North Carolina 'are in the main governed by the same general principles which control in ascertaining the meaning of all written instruments.' " *Preston*, 325 N.C. at 449, 385 S.E.2d at 478 (quoting *Perry v. Stancil*, 237 N.C. 442, 444, 75 S.E.2d 512, 514 (1953)). In *Sessions v. Columbus Cty.*, 214 N.C. 634, 638, 200 S.E. 418, 420 (1939), this Court stated that "[r]econciliation is a postulate of constitutional as well as of statutory construction." Thus, reconciliation is a fundamental goal, be it in constitutional or statutory interpretation, and North Carolina courts should make every effort to determine whether State provisions, as interpreted under State law, are inconsistent with controlling federal law before applying a severability analysis to strike State provisions as wholly unenforceable.

As part of our constitutional interpretation, it is fundamental "to give effect to the intent of the framers of the organic law and of the people adopting it." *Perry*, 237 N.C. at 444, 75 S.E.2d at 514. More importance is to be placed upon the intent and purpose of a provision than upon the actual language used. *Id.* "[I]n arriving at the intent, we are not required to accord the language used an unnecessarily literal meaning. Greater regard is to be given to the dominant purpose than to the use of any particular words . . . ." *Id.* This Court will consider the "history of the questioned provision and its antecedents, the conditions that existed prior to its enactment, and the purposes sought

**STEPHENSON v. BARTLETT**

[355 N.C. 354 (2002)]

to be accomplished by its promulgation" when interpreting the State Constitution in light of federal requirements. *Sneed v. Greensboro City Bd. of Educ.*, 299 N.C. 609, 613, 264 S.E.2d 106, 110 (1980); *see also Perry*, 237 N.C. at 444, 75 S.E.2d at 514.

We observe that the State Constitution's limitations upon redistricting and apportionment uphold what the United States Supreme Court has termed "traditional districting principles." *See Shaw*, 509 U.S. at 647, 125 L. Ed. 2d at 528. These principles include factors such as "compactness, contiguity, and *respect for political subdivisions*." *Id*. (emphasis added). The United States Supreme Court has "emphasize[d] that these criteria are important not because they are constitutionally required—they are not—but because they are objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines." *Id*. at 647, 125 L. Ed. 2d at 528-29 (citation omitted). We recognize that, like the application or exercise of most constitutional rights, the right of the people of this State to legislative districts which do not divide counties is not absolute. *See, e.g.*, Laurence H. Tribe, *American Constitutional Law* § 12-2 (2d ed. 1988); John E. Nowak & Ronald D. Rotunda, *Constitutional Law* § 16.7 (5th ed. 1995) (noting that although the provisions of the First Amendment appear absolute, they are subject to a balancing of interests). In reality, an inflexible application of the WCP is no longer attainable because of the operation of the provisions of the VRA and the federal "one-person, one-vote" standard, as incorporated within the State Constitution. This does not mean, however, that the WCP is rendered a legal nullity if its beneficial purposes can be preserved consistent with federal law and reconciled with other state constitutional guarantees.

The 2001 legislative redistricting plans violate the WCP for reasons unrelated to compliance with federal law. Although the WCP demonstrates a clear intent to keep county boundaries intact *whenever possible* during the legislative redistricting process, the 2001 Senate redistricting plan divides 51 of 100 counties into different Senate districts. The 2001 House redistricting plan divides 70 out of 100 counties into different House districts. The General Assembly may consider partisan advantage and incumbency protection in the application of its discretionary redistricting decisions, *see Gaffney v. Cummings*, 412 U.S. 735, 37 L. Ed. 2d 298 (1973), but it must do so in conformity with the State Constitution. To hold otherwise would abrogate the constitutional limitations or "objective constraints" that the people of North Carolina have imposed on legislative redistricting

and reapportionment in the State Constitution. Accordingly, the WCP remains valid and binding upon the General Assembly during the redistricting and reapportionment process, as more fully explained below, except to the extent superseded by federal law.[3]

### Effect of 1981 USDOJ Objection to Redistricting Plan and Decision of Federal District Court in *Cavanagh v. Brock*

Focusing on correspondence received from the USDOJ during 1981 and 1982, defendants assert that the USDOJ's objection to the 1981 State legislative redistricting plans now renders the WCP unenforceable. They also contend that *Cavanagh v. Brock*, 577 F. Supp. 176, controls the resolution of this issue. Finally, they assert that plaintiffs' interpretation of the State constitutional provisions, when coupled with the effect of the VRA, will result in a rewrite of the State Constitution and a mechanical interpretation of the same.

With regard to the USDOJ's objection to the 1981 proposed legislative redistricting plans—plans that failed to include *any* majority-minority VRA districts—the USDOJ indicated that it was unable to conclude that North Carolina's application of the WCP at that time did not have a discriminatory purpose or effect in the forty covered counties. In a letter dated 30 November 1981, the USDOJ pointed out that its analysis "show[ed] that the prohibition against dividing the forty covered counties in the formation of Senate and House districts predictably require[d], and ha[d] led to the use of large, multimember districts." Letter from William Bradford Reynolds, Assistant Attorney General, Civil Rights Division, U.S. Department of Justice, to Alex Brock, Executive Secretary-Director, N.C. State Board of Elections (Nov. 30, 1981) [hereinafter 1981 USDOJ letter]. Thus, in reviewing the 1968 constitutional amendments, the USDOJ analyzed these amendments in the context of redistricting plans that included large, multi-member districts. The USDOJ further stated in this letter: "This determination with respect to the jurisdictions covered by Section 5 of the Voting Rights Act should in no way be regarded as precluding the State from following a policy of preserving county lines whenever feasible in formulating its new districts. Indeed, this is the policy in many states, subject only to the preclearance require-

---

3. We note that other states have faced similar issues under their respective state constitutions and, where possible, have concluded that county lines should be maintained. *See In re Reapportionment of Colo. Gen. Assembly*, 45 P.3d 1237, 1248-49, (2002); *Hellar v. Cenarrusa*, 106 Idaho 571, 574-75, 682 P.2d 524, 527-28 (1984); *Fischer v. State Bd. of Elections*, 879 S.W.2d 475, 479 (Ky. 1994); *State ex rel. Lockert v. Crowell*, 631 S.W.2d 702, 714-15 (Tenn. 1982).

ments of Section 5, where applicable." *Id.* In a subsequent letter dated 20 January 1982, the USDOJ specifically concluded that "the use of large, multi-member districts effectively submerge[d] sizable concentrations of black population[s] into a majority white electorate." Letter from William Bradford Reynolds, Assistant Attorney General, Civil Rights Division, U.S. Department of Justice, to Alex Brock, Executive Secretary-Director, N.C. State Board of Elections (Jan. 20, 1982) [hereinafter 1982 USDOJ letter]. On *this* basis, the 1981 plans were not precleared.

It is apparent from the full context of these letters that the USDOJ concluded that the plans, as then submitted, would result in large multi-member districts having a retrogressive effect on minority voters. Nowhere in these letters is there a statement that the amendments themselves are considered either unconstitutional or unenforceable in conjunction with an acceptable redistricting plan having no retrogressive effect, and defendants have offered no authority supporting such a proposition.

Our opinion that the 1981 and 1982 USDOJ letters do not abrogate the WCP is buttressed by the USDOJ's issuance of its administrative guidance for states concerning redistricting under the VRA. These guidelines provide: "[C]ompliance with Section 5 of the Voting Rights Act may require the jurisdiction to depart from strict adherence to certain of its redistricting criteria. For example, criteria which require the jurisdiction to . . . follow county, city, or precinct boundaries . . . *may need to give way to some degree* to avoid retrogression." Guidance Concerning Redistricting and Retrogression Under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, 66 Fed. Reg. 5413 (Jan. 18, 2001) (emphasis added). The USDOJ Civil Rights Division clearly considers following political boundaries, including county lines, to be an acceptable criterion but one that "may" have to give way "to some degree" in order to avoid retrogression. Significantly, both the USDOJ's letters to the State of North Carolina and its *own* administrative guidelines reflect that states need only modify, not necessarily abrogate, the application of whole-county redistricting limitations.

Thus, our review of the USDOJ's position on the WCP, as represented by its response to North Carolina's submission in 1981 and its administrative regulations concerning use of "whole-county" requirements, leads us to conclude that the WCP is not facially illegal or unenforceable relative to federal law. We believe our interpretation naturally flows from the language of the USDOJ's representation that

its policy "should in no way be regarded as precluding the State [of North Carolina] from following a policy of preserving county lines whenever feasible in formulating new districts." The 1981 USDOJ letter, by its own terms, merely disallows a redistricting plan that adheres strictly to a "whole-county" criterion without complying with the VRA.

Defendants further argue that *Cavanagh,* 577 F. Supp. 176, voided the WCP. For the reasons set forth below, we respectfully disagree with the District Court's interpretation of the State Constitution. *See Union Pac. R.R. Co. v. Board of Comm'rs of Weld Cty.,* 247 U.S. 282, 287, 62 L. Ed. 1110, 1117 (1918); *see also Harter v. Vernon,* 101 F.3d 334, 342 (4th Cir. 1996) ("Our holdings on questions of state law do not bind state courts"), *cert. denied,* 521 U.S. 1120, 138 L. Ed. 2d 1014 (1997); *Preston,* 325 N.C. at 449-50, 385 S.E.2d at 479; *White v. Pate,* 308 N.C. 759, 766, 304 S.E.2d 199, 203 (1983).

As previously noted, North Carolina courts should first determine whether provisions of the State Constitution, as interpreted under state law, are inconsistent with federal law before applying a severability analysis. Where, as here, the primary purpose of the WCP can be effected to a large degree without conflict with federal law, it should be adhered to by the General Assembly to the maximum extent possible.[4] Also, in addressing the intent of the General Assembly, the District Court in *Cavanagh* apparently failed to consider the history of North Carolina's use of whole-county districts for nearly 200 years prior to 1964. The Court in *Cavanagh* cited no authority to support its conclusion that the General Assembly in 1968 would not have intended or desired to adopt the WCP if that provision could not be fully applicable in all counties. Furthermore, the Court's ruling in *Cavanagh* was not a necessary conclusion based on the 1981 USDOJ letter concerning whole-county districts. As discussed above, the USDOJ's objection to the 1981 redistricting plans does not stand for the proposition that the constitutional "whole-county" provisions are *per se* unenforceable. For all these reasons, we reject defendants' contention that the District Court's holding in *Cavanagh* should be followed in our interpretation of the North Carolina Constitution.

We also reject defendants' assertion that enforcement of the WCP in some way rewrites the State Constitution. Defendants contend,

---

4. Although no federal law has preempted this Court's authority to interpret the WCP as it applies statewide, we acknowledge that complete compliance with federal law is the first priority before enforcing the WCP.

**STEPHENSON v. BARTLETT**

[355 N.C. 354 (2002)]

among other things, that allowing the WCP to retain some measure of enforceability tacitly adds new words to these provisions, i.e., counties may not be split "except to the extent required by federal law." Defendants overlook the fact, however, that compliance with federal law is not an implied, but rather an express condition to the enforceability of *every* provision in the State Constitution. Moreover, our holding accords the fullest effect possible to the stated intentions of the people through their duly adopted State Constitution, the subject provisions of which have remained in place without amendment since 1971. Defendants' "all-or-nothing" interpretation is inordinately mechanical in its application, leaving no room to carry out the spirit or intent of the State Constitution in contravention of time-honored principles of federalism. *See Printz v. United States*, 521 U.S. 898, 921, 138 L. Ed. 2d 914, 935-36 (1997). This construction needlessly burdens millions of citizens with unnecessarily complicated and confusing district lines.

Since *Cavanagh*, many North Carolina legislative districts have been increasingly gerrymandered to a degree inviting widespread contempt and ridicule. *See, e.g.*, "Red-Light District: It's time to draw the line on gerrymandering," John Fund's Political Diary, WSJ.com Opinion Journal from the Wall Street Journal Editorial Page, *at* http://www.opinionjournal.com/diary/?id=105001756 (Mar. 13, 2002) ("[e]lections in many semifree Third World nations routinely offer more choices than many North Carolina residents will have" under the 2001 legislative redistricting plans); *How to Rig an Election*, The Economist, Apr. 27, 2002, at 29, 30 ("In a normal democracy, voters choose their representatives. In America, it is rapidly becoming the other way around" and asserting that "North Carolina [has been] long notorious for outrageous reapportionment.")

We thus hold that because the General Assembly enacted its 2001 legislative redistricting plans in violation of the WCP, N.C. Const. art. II, §§ 3(3), 5(3), these plans are unconstitutional and are therefore void. Accordingly, the trial court properly granted summary judgment in favor of plaintiffs on this claim.

## REMEDIAL ANALYSIS

Having determined that defendants violated the WCP in enacting the 2001 legislative redistricting plans, we must next consider the practical consequences of our holding and address any required remedial measures. The United States Supreme Court has recognized the "power of the judiciary of a State to require valid reapportion-

ment or to formulate a valid redistricting plan." *Scott*, 381 U.S. at 409, 14 L. Ed. 2d at 478. Indeed, both "[r]eason and experience argue that courts empowered to invalidate an apportionment statute which transgresses constitutional mandates cannot be left without the means to order appropriate relief." *Terrazas v. Ramirez*, 829 S.W.2d 712, 718 (Tex. 1991); *see also Brooks v. Hobbie*, 631 So. 2d 883, 887-90 (Ala. 1993).

Plaintiffs contend that remedial compliance with the WCP requires the formation of multi-member legislative districts in which all legislators would be elected "at-large." For instance, plaintiffs' suggested five percent whole-county plan for the North Carolina House would require, within Mecklenburg and Gaston Counties, the creation of a single multi-member House district having a contingent of ten Representatives along with the creation of three "submerged" single-member VRA districts. For the following reasons, we reject plaintiffs' proposed remedy.

It is clear, as a practical matter in view of federal law, that application of the WCP in a strictly mechanical fashion would be inconsistent with other provisions of federal law and the State Constitution. Specifically, the WCP cannot be applied in isolation or in a manner that fails to comport with other requirements of the State Constitution. Consequently, as we reject plaintiffs' proposed remedy in the instant case, we recognize we cannot abdicate our duty of redressing the demonstrated constitutional violation which occurred in the present case. *See generally Scott*, 381 U.S. at 409, 14 L. Ed. 2d at 478.

Although the United States Supreme Court has held that multi-member districts are not *per se* invalid under the federal Equal Protection Clause, *Whitcomb v. Chavis*, 403 U.S. 124, 142, 29 L. Ed. 2d 363, 375 (1971), the Court has nonetheless instructed federal district courts to avoid the creation of multi-member districts in the remedial stage of an apportionment dispute, *Connor v. Johnson*, 402 U.S. 690, 692, 29 L. Ed. 2d 268, 270-71 (1971). The Court has observed that ballots containing multi-member districts "tend to become unwieldy, confusing, and too lengthy to allow thoughtful consideration."[5] *Chapman*, 420 U.S. at 15, 42 L. Ed. 2d at 778. The Court has also recognized that multi-member districts may well "operate to minimize or cancel out the voting strength of racial or political ele-

---

5. Federal law expressly requires that states use single-member districts in reapportioning their congressional representation. *See* 2 U.S.C. § 2c (2000); *Whitcomb*, 403 U.S. at 158-59 n.39, 29 L. Ed. 2d at 385 n.39.

ments of the voting population." *Fortson v. Dorsey*, 379 U.S. 433, 439, 13 L. Ed. 2d 401, 405 (1965), *quoted in Gingles*, 478 U.S. at 47, 92 L. Ed. 2d at 44.

Amicus asserts that the voting strength of minority voters will be unlawfully diluted by application of the WCP in a manner which permits the creation of multi-member legislative districts containing predominately nonminority voters adjacent to single-member VRA districts. At a minimum, by asserting this argument, amicus challenges the legal propriety of multi-member districts within North Carolina legislative redistricting plans. Accordingly, we turn to address the constitutional propriety of such districts, in the public interest, in order to effect a comprehensive remedy to the constitutional violation which occurred in the instant case.

Article I, Section 19 of the State Constitution provides, in pertinent part, that "[n]o person shall be denied the equal protection of the laws." We observe, as amicus alleges, that voters in single-member legislative districts, surrounded by multi-member districts, suffer electoral disadvantage because, at a minimum, they are not permitted to vote for the same number of legislators and may not enjoy the same representational influence or "clout" as voters represented by a slate of legislators within a multi-member district. Conversely, voters in multi-member districts invariably suffer the adverse consequences described by the United States Supreme Court: unwieldy, confusing, and unreasonably lengthy ballots; and minimization of minority voting strength. *Gingles*, 478 U.S. at 47, 92 L. Ed. 2d at 44; *Chapman*, 420 U.S. at 15, 42 L. Ed. 2d at 778; *see also Fortson*, 379 U.S. at 439, 13 L. Ed. 2d at 405.

The Equal Protection Clause of Article I, Section 19 of the State Constitution prohibits the State from denying any person the equal protection of the laws. Before embarking upon an equal protection analysis, we must first determine the level of scrutiny to apply. *Department of Transp. v. Rowe*, 353 N.C. 671, 675, 549 S.E.2d 203, 207 (2001), *cert. denied*, —— U.S. ——, 151 L. Ed. 2d 972 (2002). Strict scrutiny, this Court's highest tier of review, applies "when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *White*, 308 N.C. at 766, 304 S.E.2d at 204; *see also Texfi Indus., Inc. v. City of Fayetteville*, 301 N.C. 1, 11, 269 S.E.2d 142, 149 (1980). Under strict scrutiny, a challenged governmental action is unconstitutional if the State cannot establish that it is narrowly tailored to advance a compelling governmental interest. *Northampton Cty.*

*Drainage Dist. No. One v. Bailey*, 326 N.C. 742, 746, 392 S.E.2d 352, 355 (1990).

It is well settled in this State that "the right to vote on equal terms is a fundamental right." *Id.* at 747, 392 S.E.2d at 356; *see also Preston*, 325 N.C. at 454, 385 S.E.2d at 481; *Texfi Indus., Inc.*, 301 N.C. at 12, 269 S.E.2d at 149. The classification of voters into both single-member and multi-member districts within plaintiffs' proposed remedial plans necessarily implicates the fundamental right to vote on equal terms, and thus strict scrutiny is the applicable standard.

In applying such standard, we note, for instance, that under plaintiffs' proposed five percent House Plan, voters in multi-member District 36 (Buncombe, McDowell, and Burke Counties) may vote for a contingent of five Representatives, while voters in neighboring District 38 (Haywood and Swain Counties) elect only one Representative. Likewise, in plaintiffs' proposed five percent Senate Plan, multi-member District 13 (Caswell, Rockingham, Guilford, Randolph, Davidson, and Forsyth Counties) voters elect a contingent of five Senators, while in neighboring District 19 (Rowan and Davie Counties), voters elect only one Senator. These classifications, as used within plaintiffs' proposed remedial plans, create an impermissible distinction among similarly situated citizens based upon the population density of the area in which they reside.

In this context, we examine the provisions of Article II, Sections 3(1) and 5(1) of the State Constitution to determine whether the use of both single-member and multi-member districts within the same redistricting plan violates the Equal Protection Clause of the State Constitution. *See* N.C. Const. art. I, § 19. We recognize that a constitution cannot be in violation of itself, *Leandro v. State*, 346 N.C. 336, 352, 488 S.E.2d 249, 258 (1997), and that all constitutional provisions must be read *in pari materia*, *In re Peoples*, 296 N.C. 109, 159, 250 S.E.2d 890, 919 (1978) (citing *Williamson v. City of High Point*, 213 N.C. 96, 103, 195 S.E. 90, 94 (1938), *cert. denied*, 442 U.S. 929, 61 L. Ed. 2d 297 (1979), and *Parvin v. Board of Comm'rs of Beaufort Cty.*, 177 N.C. 508, 511, 99 S.E. 432, 434 (1919)). These rules of construction require us to construe Article II, Sections 3(1) and 5(1) in conjunction with Article I, Section 19 in such a manner as to avoid internal textual conflict.

Article II, Sections 3(1) and 5(1) begin by stating that "[e]ach Senator [or Representative] shall represent, as nearly as may be, an equal number of inhabitants." These words embody the principle of

"one-person, one-vote." The proviso that follows in each section adds "the number of inhabitants that each Senator [or Representative] represents being determined for this purpose by dividing the population of the district that he [or she] represents by the number of Senators [or Representatives] apportioned to that district." These provisos arguably contemplate multi-member districts by stating that, for apportionment purposes, each member of the General Assembly from such a district represents a fraction of the voters in that district. The principle of "one-person, one-vote" is preserved because the number of voters in each member's fraction of the multi-member district is the same as the number of voters in a single-member district.

However, in practice, these theoretical divisions within such districts do not work because every Representative or Senator from such a district represents and is supported by every resident in the district, not just those voters making up the fraction of the district comprising the theoretical constituency. Members do not "divide the population of the district that he [or she] represents" to determine their "true" constituency. As a consequence, those living in such districts may call upon a contingent of responsive Senators and Representatives to press their interests, while those in a single-member district may rely upon only one Senator or Representative. Thus, although the people have mandated in their Constitution that all North Carolinians enjoy substantially equal voting power, *Northampton Cty. Drainage Dist. No. One*, 326 N.C. at 746, 392 S.E.2d at 355, the same Constitution contains language which appears to deny voters in single-member districts their right to substantially equal legislative representation. Accordingly, and consistent with the analysis found elsewhere in this opinion, we hold that the language quoted above purporting to allow multi-member districts is effective only within a limited context. We conclude that, while instructive as to how multi-member districts may be used compatibly with "one-person, one-vote" principles, Article II, Sections 3(1) and 5(1) are not affirmative constitutional mandates and do not authorize use of both single-member and multi-member districts in a manner violative of the fundamental right of each North Carolinian to substantially equal voting power.

The proposition that use of both single-member and multi-member districts within the same redistricting plan violates equal protection principles is not novel. In *Kruidenier v. McCulloch*, 258 Iowa 1121, 142 N.W.2d 355, *cert. denied*, 385 U.S. 851, 17 L. Ed. 2d 80

(1966), the Iowa Supreme Court concluded that legislative redistricting schemes, in which there were multi-member districts and single-member districts in the same house plan, unconstitutionally impaired the rights of residents within single-member districts. The Court observed the following example from the apportionment scheme at issue there: "The resident of Warren County can vote for 1/61 of the senate and 1/124 of the house. The resident of Polk County can vote for 1/12 of the senate and 1/11 of the house." *Id.* at 1147, 142 N.W.2d at 370. The Court concluded that the "mere statement of this example disclose[d] the basic unfairness, inequality and lack of uniformity inherent in such a scheme of legislative apportionment" and stated:

> *Equal voting power for all citizens is the goal.* Proposed legislation requires a majority vote of the members of each house to become a law. It is a political reality that legislators are much more inclined to listen to and support a constituent than an outsider with the same problem. It is equally basic that much legislative work is done by committees and there is a distinct advantage in having one's own representative sitting as a member of a committee considering legislation in which one has an interest. . . . Particularly in personal interest legislation the resident of [the multi-member district] has an unfair and unequal advantage over the resident of . . . any other single-member district. He has a much greater opportunity to find legislators to espouse his cause and a much greater chance that one or more of his representatives will be on the committee to which his legislation is assigned. His voting power is much greater.

*Id.* at 1147-48, 142 N.W.2d at 370-71 (emphasis added).

The Iowa Supreme Court concluded that any legislative apportionment scheme containing both multi-member and single-member legislative districts unlawfully impaired the right of a resident within a single-member district under both the Iowa Constitution and the Constitution of the United States. *Id.* at 1148, 1156, 142 N.W.2d at 371, 375. The Iowa Supreme Court qualified its holding by stating that, to the extent a rational plan of apportionment could not be achieved by using all single-member districts, the possibility existed that use of some multi-member districts could be constitutionally permissible. *Id.*

In our view, use of *both* single-member and multi-member districts within the same redistricting plan violates the Equal Protection

STEPHENSON v. BARTLETT

[355 N.C. 354 (2002)]

Clause of the State Constitution[6] unless it is established that inclusion of multi-member districts advances a compelling state interest. Therefore, the trial court is directed on remand to afford the opportunity to establish, at an evidentiary hearing, that the use of such districts advances a compelling state interest within the context of a specific, proposed remedial plan.[7]

With respect to redistricting plans, undoubtedly, federal law impacts the functional application of the WCP but does not, as suggested by defendants, totally void it. To accept defendants' logic would necessarily imply that any time Congress enacted a law which even superficially touched upon an area of primary state responsibility, all related state provisions within the challenged area of state jurisprudence would be immediately and entirely nullified. Such a presumption reflects a misunderstanding of federal preemption analysis.

As noted by the United States Supreme Court in *Shaw v. Reno* and by the USDOJ in its previous correspondence and administrative regulations, operation of federal law does not preclude states from recognizing traditional political subdivisions when drawing their legislative districts. *Shaw*, 509 U.S. at 647, 125 L. Ed. 2d at 528; *see also* 66 Fed. Reg. 5413; *Growe*, 507 U.S. at 34, 122 L. Ed. 2d at 400; 1981 USDOJ letter. Although we discern no congressional intent, either express or implied, to preempt the WCP through the operation of the VRA, we also recognize that the WCP may not be interpreted literally because of the VRA and "one-person, one-vote" principles. *See Guerra*, 479 U.S. at 280-81, 93 L. Ed. 2d at 623; 1981 USDOJ letter. Federal law, therefore, preempts the State Constitution only to the extent that the WCP actually conflicts with the VRA and other federal requirements relating to state legislative redistricting and reapportionment. *See Guerra*, 479 U.S. at 281, 93 L. Ed. 2d at 623. It remains possible, therefore, to comply with both the VRA and the WCP as reconciled with other provisions of state law. *See Florida Lime*, 373 U.S. at 142, 10 L. Ed. 2d at 256-57. Our interpretation of the WCP does

---

6. It is beyond dispute that this Court "ha[s] the authority to construe [the State Constitution] differently from the construction by the United States Supreme Court of the Federal Constitution, as long as our citizens are thereby accorded no lesser rights than they are guaranteed by the parallel federal provision." *State v. Carter*, 322 N.C. 709, 713, 370 S.E.2d 553, 555 (1988).

7. In the event such a hearing is requested on remand, the trial court is authorized to take all necessary remedial actions to ensure that the primary elections for legislative offices are conducted in a timely and expeditious manner and consistent with the general election scheduled for 5 November 2002.

not create a conflict with the VRA, nor does it frustrate the objectives and purposes of federal law. *See id.* Accordingly, the contention that the WCP is wholly unenforceable as a matter of federal preemption analysis is untenable.

In addition to our obligation to ensure that the WCP complies with federal law, it must also be reconciled with other legal requirements of the State Constitution. In this respect, an application of the WCP that abrogates the equal right to vote, a *fundamental* right under the State Constitution, must be avoided in order to uphold the principles of *substantially equal voting power* and *substantially equal legislative representation* arising from that same Constitution.

Without question, the intent of the WCP is to limit the General Assembly's ability to draw legislative districts without according county lines a reasonable measure of respect. Prior to the imposition of "one-person, one-vote" and VRA requirements, implementation of the provision was simple and straightforward. However, despite the advent of the VRA and "one-person, one-vote" principles, we are not permitted to construe the WCP mandate as now being in some fashion unmanageable, or to limit its application to only a handful of counties. Any attempt to do so would be an abrogation of the Court's duty to follow a reasonable, workable, and effective interpretation that maintains the people's express wishes to contain legislative district boundaries within county lines whenever possible. As we stated in *State ex rel Martin v. Preston*, "Progress demands that government should be further refined in order to best respond to changing conditions. Several provisions of our Constitution provide the elasticity which ensures the responsive operation of government." *Preston*, 325 N.C. at 458, 385 S.E.2d at 484.

To accomplish this task, we accept the obvious: that in the absence of large multi-member districts, the ability to substantially preserve external county boundaries while complying with the VRA, "one-person, one-vote," and State equal protection requirements, would be impossible without the ability to draw single-member districts within counties or aggregated groups of counties. As a result, the WCP is interpreted consistent with federal law and reconciled with equal protection requirements under the State Constitution by requiring the formation of single-member districts in North Carolina legislative redistricting plans. The boundaries of such single-member districts, however, may not cross county lines except as outlined below.

[2] Consistent with the legal analysis set forth above, we direct the trial court, during the remedial stage of the instant proceeding, to ensure that redistricting plans for the North Carolina Senate and North Carolina House of Representatives comply with the following requirements.

On remand, to ensure full compliance with federal law, legislative districts required by the VRA shall be formed prior to creation of non-VRA districts. The USDOJ precleared the 2001 legislative redistricting plans, and the VRA districts contained therein, on 11 February 2002. This administrative determination signified that, in the opinion of the USDOJ, the 2001 legislative redistricting plans had no retrogressive effect upon minority voters. In the formation of VRA districts within the revised redistricting plans on remand, we likewise direct the trial court to ensure that VRA districts are formed consistent with federal law and in a manner having no retrogressive effect upon minority voters. To the maximum extent practicable, such VRA districts shall also comply with the legal requirements of the WCP, as herein established for all redistricting plans and districts throughout the State.

[3] In forming new legislative districts, any deviation from the ideal population for a legislative district shall be at or within plus or minus five percent for purposes of compliance with federal "one-person, one-vote" requirements.

In counties having a 2000 census population sufficient to support the formation of one non-VRA legislative district falling at or within plus or minus five percent deviation from the ideal population consistent with "one-person, one-vote" requirements, the WCP requires that the physical boundaries of any such non-VRA legislative district not cross or traverse the exterior geographic line of any such county.

When two or more non-VRA legislative districts may be created within a single county, which districts fall at or within plus or minus five percent deviation from the ideal population consistent with "one-person, one-vote" requirements, single-member non-VRA districts shall be formed within said county. Such non-VRA districts shall be compact and shall not traverse the exterior geographic boundary of any such county.

In counties having a non-VRA population pool which cannot support at least one legislative district at or within plus or minus five percent of the ideal population for a legislative district or, alternatively,

counties having a non-VRA population pool which, if divided into districts, would not comply with the at or within plus or minus five percent "one-person, one-vote" standard, the requirements of the WCP are met by combining or grouping the minimum number of whole, contiguous counties necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard. Within any such contiguous multi-county grouping, compact districts shall be formed, consistent with the at or within plus or minus five percent standard, whose boundary lines do not cross or traverse the "exterior" line of the multi-county grouping; provided, however, that the resulting interior county lines created by any such groupings may be crossed or traversed in the creation of districts within said multi-county grouping but only to the extent necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard. The intent underlying the WCP must be enforced to the maximum extent possible; thus, only the smallest number of counties necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard shall be combined, and communities of interest should be considered in the formation of compact and contiguous electoral districts.

Because multi-member legislative districts, at least when used in conjunction with single-member legislative districts in the same redistricting plan, are subject to strict scrutiny under the Equal Protection Clause of the State Constitution, multi-member districts shall not be used in the formation of legislative districts unless it is established that such districts are necessary to advance a compelling governmental interest.

Finally, we direct that any new redistricting plans, including any proposed on remand in this case, shall depart from strict compliance with the legal requirements set forth herein only to the extent necessary to comply with federal law.

This Court has verified independently that the above requirements of the State Constitution, including the WCP and the Equal Protection Clause, can in fact be reconciled and applied in a manner consistent therewith, as well as with federal requirements, including the VRA and "one-person, one-vote" principles. This verification was achieved through use of a software program which is used by the General Assembly during the redistricting process and which the General Assembly makes generally available to members of the public.

STEPHENSON v. BARTLETT

[355 N.C. 354 (2002)]

The General Assembly optimally should be afforded the first opportunity to enact new redistricting plans for the North Carolina Senate and North Carolina House of Representatives based on the 2000 census and the constitutional requirements which we have upheld in this opinion. Defendants have represented, however, that there is insufficient time for the General Assembly to enact new plans for use in the 2002 election cycle. Accordingly, we direct the trial court to conduct a hearing, on an expedited basis, on the question of the feasibility of allowing the General Assembly the first opportunity to develop new redistricting plans. The General Assembly should be accorded the first opportunity to draw the new plans if so doing will not disrupt the timing of the 2002 general election. In the event defendants are unable to demonstrate that the General Assembly is able to develop new redistricting plans in accordance with the timetable established by the trial court, the trial court is authorized and directed to seek proposed remedial plans,[8] review and adopt temporary or interim remedial plans for the North Carolina Senate and North Carolina House of Representatives, and seek preclearance thereof, for use in the 2002 election cycle.[9]

Based upon our thorough review of the extensive materials filed in this Court in this case, we believe that the people's insertion of a whole-county requirement within their Constitution was not an historical accident. Rather, we believe that this provision was inserted by the people of North Carolina as an objective limitation upon the authority of incumbent legislators to redistrict and reapportion in a manner inconsistent with the importance that North Carolinians traditionally have placed upon their respective county units in terms of their relationship to State government. Enforcement of the WCP will, in all likelihood, foster improved voter morale, voter turnout, and public respect for State government, and specifically, the General Assembly as an institution; will assist election officials in conducting elections at lower cost to the taxpayers of this State; and will instill a renewed sense of community and regional cooperation within the respective countywide or regionally formed legislative delegations mandated by the WCP. For instance, there will again be countywide delegations and, in rural areas, contiguous multi-county delegations

8. The trial court should consider whether a court-appointed expert would be of assistance in ensuring compliance with federal law and state constitutional requirements. See N.C.G.S. § 8C-1, Rule 706 (1999).

9. In this event, the General Assembly shall be accorded the opportunity to enact new redistricting plans, consistent with the constitutional requirements set forth herein, during its 2003 session.

**STEPHENSON v. BARTLETT**

[355 N.C. 354 (2002)]

in the General Assembly, which, in working with legislative delegations from other regions of the State, can more effectively work together in a positive manner on matters of mutual concern to citizens of our State.

Accordingly, the orders of the trial court below are affirmed as modified,[10] the stay issued by this Court is lifted, and the trial court is authorized to enter such further orders as necessary to implement our holdings in this opinion.

AFFIRMED AS MODIFIED.

Pursuant to Rule 32 of the North Carolina Rules of Appellate Procedure, the mandate of this opinion is expedited and shall issue at 12:00 o'clock noon on 3 May 2002.

---

10. We have reviewed and considered all other issues and assignments of error presented by the parties and conclude that they do not need to be addressed in order to effect a full and proper resolution of this case.

**STEPHENSON v. BARTLETT**

[355 N.C. 354 (2002)]

Attachment A
2001 Senate Plan

Attachment B
2001 House Plan

**STEPHENSON v. BARTLETT**

[355 N.C. 354 (2002)]

Justice ORR concurring in part and dissenting in part.

While I agree with the ultimate conclusion of the majority—that the trial court correctly ruled the redistricting plans at issue unconstitutional—I do so for different reasons. As to the remedial portion of the majority decision, I disagree with the majority's utilization of a State Equal Protection argument to conclude that "multi-member" districts are unconstitutional and with the majority's imposition of a plus-or-minus-five percent standard for drawing new districts. Therefore, I am compelled to write separately and to concur in part and dissent in part to the majority's opinion.

I.

The second issue advanced by the defendants is that "the trial court impermissibly enforced ineffective constitutional amendments when it struck down the enacted redistricting plans." The basis for this argument is that the state constitutional provisions at issue are unenforceable under section 5 of the Voting Rights Act (VRA). Defendants argue that "because the constitutional amendments were never precleared, they have no force and effect and cannot be relied upon in redrawing the State's legislative districts." As to the portion of the majority opinion addressing defendants' contentions, under the heading of "Effect of 1981 USDOJ Objection to Redistricting Plan and Decision of Federal District Court in *Cavanagh v. Brock*," 577 F. Supp. 176 (E.D.N.C., 1983), I concur in both the reasoning and result.

The constitutional amendments at issue were properly passed by the General Assembly and adopted by the voters of this State. *See* Act of May 31, 1967, ch. 640, 1967 N.C. Sess. Laws 704; John L. Sanders & John F. Lomax, Jr., *Amendments to the Constitution of North Carolina: 1776-1996*, at 15 (Inst. of Gov't, Univ. of N.C. at Chapel Hill, 1997). These amendments were further carried forward in the revision and updating of the North Carolina Constitution submitted to the people in 1970 and duly enacted. Thus, on their face, these amendments are valid and binding provisions of our State Constitution. As a result, any constitutional problems with regard to these amendments could arise only if the application of the provisions conflicted with the United States Constitution or federal legislation amid a redistricting plan's submission. The view that the so-called "whole-county provisions" (WCP) can be challenged only in the context of a specific redistricting plan is further buttressed by the very language of the constitutional provisions at issue. "No county

STEPHENSON v. BARTLETT

[355 N.C. 354 (2002)]

shall be divided in *the formation of* a [legislative] district." N.C. Const. art II, §§ 3(3), 5(3) (emphasis added (hereinafter collectively referred to as the "WCP" for purposes of reference to either or both the Senate provision, section 3(3), and the House of Representative provision, section 5(3)). The WCP, therefore, by its own terms, means absolutely nothing except when it is utilized to form a district. Thus, as the majority correctly concludes, defendants' argument—in sum, that the provision has somehow been rendered inapplicable—must fail because the provision is mandatory and binding unless *the plan utilizing it* is shown to be in violation of federal law.

## II.

Having determined that the WCP is a valid and binding state constitutional provision, the next fundamental issue is whether the redistricting plans submitted by the State violate the WCP. The majority, having earlier in its opinion noted the inordinate number of divided counties in the submitted plans, holds in one sentence that such plans violate the WCP and are therefore void. The majority then proceeds immediately to the remedial portion of the opinion. While ultimately reaching a similar conclusion, I find it necessary and appropriate to address defendants' core argument that county lines must be divided because of the federal mandatory requirements of "one person, one vote" and the Voting Rights Act's restrictions and defendants' contention that the trial court erred in its order by establishing criteria under which new redistricting plans are to be drawn.

In large part, defendants' argument questions the necessity of large multi-member districts—either single-county or multi-county—and the inherent failings of any criteria allowing such districts. Plaintiffs' counter-argument and proposed remedial plan relies in large part on the use of multi-member districts, many of which incorporate multiple counties, ostensibly in order to comply with the WCP.

It is necessary to examine the contentions of the parties in the context of the application and interpretation of the WCP, as well as in the context of the WCP's interrelationship with other constitutional provisions—i.e., those that govern the General Assembly's constitutional duty to draw legislative districts. Our examination of the constitutional provisions at issue is guided by the following interpretation principles articulated by then Justice Joseph Branch (later Chief Justice) some twenty-five years ago:

STEPHENSON v. BARTLETT

[355 N.C. 354 (2002)]

The North Carolina Constitution expresses the will of the people of this State and is, therefore, the supreme law of the land. Thus, it is a fundamental principle of constitutional construction that effect must be given to the intent of the people adopting the Constitution, or an amendment thereto, and that constitutional provisions should be construed in consonance with the objectives and purposes sought to be accomplished, giving due consideration to the conditions then existing. It is well established that, in construing either the federal or State Constitution, what is implied is as much a part of the instrument as what is expressly stated. Further, amendments are to be construed harmoniously with antecedent provisions, insofar as possible.

*In re Martin*, 295 N.C. 291, 299, 245 S.E.2d 766, 771 (1978) (citations omitted).

With these guideposts of constitutional interpretation before us, I now turn to a review of the constitutional provisions applicable to this case, as expressed in Article II, Section 3 and its subsections, controlling Senate districts and apportionment, and Article II, Section 5 and its subsections, controlling districts and apportionment of the House of Representatives. These provisions, adopted in large part by the 1968 amendments to our then-existing Constitution and readopted as part of the 1971 Constitution, govern and control the process of reapportionment and district-drawing by the General Assembly.

I note at the outset that our State Constitution is not a grant of power but serves instead as a limitation of power, that all power which is not expressly limited by the people in our Constitution remains with the people, and that an act of the people through their representatives in the legislature is valid unless prohibited by that constitution. *McIntyre v. Clarkson*, 254 N.C. 510, 515, 119 S.E.2d 888, 891 (1961). Thus, the power of the people, through their elected representatives in the General Assembly, is constrained by the specific limitations imposed by duly adopted constitutional provisions. In this regard, the people of our State, by adopting the 1968 amendments and readopting them in 1970, have affirmatively placed upon the General Assembly certain limitations in the apportionment and redistricting process. It is these limitations that I am called upon to interpret and apply in the context of the issues raised in the instant case.

The first applicable limitation, as expressed in the North Carolina Constitution, Article II, Sections 3(1) and 5(1), provides in part that

"[e]ach [legislator] shall represent, as nearly as may be, an equal number of inhabitants," and stands as our State's embodiment of the "one-person, one vote" edict imposed by the United States Supreme Court in, among other cases, *Gray v. Sanders*, 372 U.S. 368, 379-81, 9 L. Ed. 2d 821, 830-31 (1963) (holding that "[t]he concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications," and "[t]he idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions," and ultimately concluding that "[t]he conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote"). Thus, Sections 3(1) and 5(1), as constitutional mandates, "express[] the will of the people of this State and [are], therefore, the supreme law of the land." *In re Martin*, 295 N.C. at 299, 245 S.E.2d at 771.

Next, we must consider the aforementioned portion of the provision's limitation in light of its remainder, which provides that "the number of inhabitants that each [legislator] represents [is] determined for this purpose by dividing the population of the district that he represents by the number of [legislators] apportioned to that district." N.C. Const. art. II, §§ 3(1), 5(1). The language of this clause is not particularly clear, nor does it plainly evidence either its intended effect or the intent of the people who voted to adopt it. However, a straightforward reading of the clause leads me to conclude that the General Assembly is required to draw districts, and apportion legislators to those districts, in such numbers as it shall determine. Historically, the practical effect and practice of the General Assembly has been to create at least some multi-member districts. In other words, a large urban county like Wake would have more than one legislator apportioned to it, and in a similar vein, smaller counties would be joined together to form a district also with more than one legislator apportioned to it. However, what this clause does not provide for is a device or method that allows multiple members apportioned to such a district to be elected in at-large fashion. Actually, the clause makes no statement at all about the manner of election; in fact, any imposition of an at-large voting methodology would directly conflict with the primary purpose of the provision, which is to embody the "one-person, one-vote" principle by requiring that each legislator represent an equal number of inhabitants.

I acknowledge that past practice has been to allow at-large elections in any district that has been apportioned multiple members. Support for such an at-large scheme has largely rested on the premise that, for example, a district of 134,000 inhabitants is somehow represented by two Representatives, *each of whom represents 67,000 inhabitants*. However, the premise proves illusory, as shown by the following. First, each Representative elected from such a district is in actuality elected by 134,000 inhabitants; second, each Representative represents each and all of those 134,000 inhabitants; third, each inhabitant of such a district has two elected Representatives, not one. As a result, the at-large election scheme deviates, *and significantly so*, from the "one-person, one-vote" principle by providing greater practical representation for inhabitants in multi-member districts with at-large elections than to those in single-member districts.

As a result of the foregoing analysis, I conclude that Article II, Sections 3(1) and 5(1) of our Constitution prohibit at-large elections within multi-member districts. And while the General Assembly may create multi-member districts (in part to comply with the WCP, as discussed below, and/or in part to comply with "one-person, one-vote" requirements or VRA requirements), those members apportioned to such districts must be elected *from a specified area* that sets off a proportional number of inhabitants based upon the ideal population for House and Senate districts (1/120th of the State's overall population, or approximately 67,000 persons for purposes of the instant case, for House districts, and 1/50th of the state's overall population, or approximately 161,000 persons for purposes of the instant case, for Senate districts).

Since I conclude that the first limitation placed upon the General Assembly by the 1968 amendments—namely, that "[e]ach [legislator] shall represent, as nearly as may be, an equal number of inhabitants," N.C. Const. art. II, §§ 3(1), 5(1)—requires that Representatives and Senators be elected from single-member districts, the fiction of at-large voting and divided representation cannot survive and be faithful to the restrictions of "one person, one vote." It is important to note that this "one-person, one-vote" limitation is no longer just a mandate of constitutional interpretation imposed by the United States Supreme Court on our State. Instead, it is a duly adopted limitation on legislative redistricting, expressly memorialized in our State Constitution, and as such reflects "the will of the people of this State and, is, therefore, the supreme law of the land." *In re Martin*, 295 N.C. at 299, 245 S.E.2d at 771.

The remedial portion of the majority opinion declares that in single counties with two or more non-VRA districts, single-member districts *must* be formed within the county; further, the majority asserts that in "contiguous multi-county groupings, interior county lines within such groupings may be crossed or traversed" in the creation of the required single-member districts. However, what the majority fails to articulate is why those circumstances do *not* violate the WCP requirement to not divide a county in the formation of a legislative district. While I concur with the result of the bare implied assertion that such division does not violate the WCP, I feel compelled to offer a legal rationale for such a conclusion.

The WCP provides that "[n]o county shall be divided in the formation of a [legislative] district." The provision, requiring that counties not be divided in drawing districts, was enacted contemporaneously with the "one-person, one-vote" provisions in Article II, Sections 3(1) and 5(1). While not facially inconsistent, the practical implementation of the two subsections is complicated by their seemingly contrasting effects. Simple geography suggests that strict adherence to the WCP may prove untenable in light of "one-person, one-vote" and VRA requirements, which may force divisions between residents of the same county. Nevertheless, this Court must reconcile and harmonize the two provisions, guided by the mandate of the people, who imposed upon the General Assembly the specific limitations that: (1) one legislator be elected from a predetermined number of designated constituents based upon "one-person, one vote" principles; and (2) counties not be divided in the formation of legislative districts.

"In order to ascertain the meaning of [an] amendment to the Constitution, it is appropriate to consider it *in pari materia* with the other sections of our Constitution which it was intended to supplement." *In re Peoples*, 296 N.C. 109, 159, 250 S.E.2d 890, 919 (1978), *cert. denied*, 442 U.S. 929, 61 L. Ed. 2d 297 (1979). "Where possible[,] amendments to the Constitution should be given a practical interpretation which will carry out the plainly manifested purpose of those who created them." *Id.* at 162, 250 S.E.2d at 920. In honoring these principles of constitutional interpretation, as set forth by then Chief Justice Susie Sharp in *In re Peoples*, we must view the "whole-county provision" in a practical light and attempt to interpret it in such a way as to carry out its manifest purpose (as expressed by the people). As noted by the majority, the intent of the provision is to limit the General Assembly's ability to draw legislative districts without regard

to county lines (a practice the current plans do extensively), and prior to the imposition of "one-person, one-vote" requirements and the VRA, implementation of the provision was simple and straight-forward. In addition, the natural advent of complications arising from the implementation of the VRA and "one-person, one vote" principles does not permit me to construe the WCP mandate as if it had been rendered unmanageable by the federal mandates, or even to limit its application to but a handful of counties. In my view, any attempt to do so would be an abrogation of the Court's duty: (1) to find a practical interpretation of the provision consistent with "one-person, one-vote" principles; and (2) to maintain the people's express wishes to contain district boundaries to county lines.

Without at-large elections in multi-member districts, the ability to purely follow external county boundaries in order to comply with VRA requirements and with "one-person, one-vote" limitations would be impossible without the ability to draw single-member districts within the confines of: (1) any multi-member district composed of a single county, and/or; (2) any multi-member district composed of multiple counties. Therefore, in order to honor the will of the people, I would conclude that single-member districts that traverse county lines within the confines of a multi-county district do not violate the WCP of our State Constitution. Similarly, I would also conclude that single-member districts that dissect a single, highly populated county do not do so either. *See Kruidenier v. McCulloch*, 258 Iowa 1121, 142 N.W.2d 355 (holding that there is no "division" of a county as long as a district is entirely within a specific county), *cert. denied*, 385 U.S. 851, 17 L. Ed. 2d 80 (1966).

To construe the WCP in a more literal fashion, as argued by the parties, would be to ultimately invalidate this provision as a practical matter.

"A constitution should not receive a technical construction as if it were an ordinary instrument or statute. It should be interpreted so as to carry out the general principles of the government, and not defeat them." The opinion quotes the following: "When we construe a constitution by implication of such rigor and inflexi-bility as to defeat the legislative regulations, we not only violate accepted principles of interpretation, but we destroy the rights which the Constitution intended to guard."

*Stedman v. City of Winston-Salem*, 204 N.C. 203, 206, 167 S.E. 813, 815 (1933) (quoting *Jenkins v. State Bd. of Elections*, 180 N.C. 169, 175, 104 S.E. 346, 348 (1920)).

As to the ultimate question before us, the record is uncontroverted that the provisions of our State Constitution limiting the General Assembly's power in redistricting have been violated by defendants' redistricting plans as submitted. Thus, such plans were properly ruled to be invalid and unconstitutional by the trial court.

### III.

As to other sections of the remedial portion of the majority's opinion, I am compelled to dissent on the grounds stated below.

While a remedy may be "merely the means of carrying into effect a substantive principle or policy," Dan B. Dobbs, *Handbook on the Law of Remedies: Damages—Equity—Restitution* § 1.2, at 3 (1973), the context of legislative redistricting—which is a duty specifically assigned to the General Assembly under our State Constitution—requires a reviewing court to impose remedial actions as narrowly as possible. Thus, having found the redistricting plans at issue unconstitutional and invalid, the majority, in my view, appears to go beyond that which is necessary to remedy the constitutional violations and command compliance. This Court should not attempt to micromanage the legislative function of drawing new districts. Regrettably, I therefore conclude that the majority has exceeded the necessary scope of its remedy function, and I must dissent from that portion of its opinion.

First, the majority imposes a new limitation on the General Assembly in creating legislative districts by mandating that "any deviation from the ideal population for a legislative district *shall* be at or within plus or minus five percent for purposes of compliance with federal 'one-person, one-vote' requirements." (Emphasis added.) While this deviation in a plan has been declared presumptively constitutional by the United States Supreme Court, *see, e.g., Brown v. Thomson*, 462 U.S. 835, 842-43, 77 L. Ed. 2d 214, 221-22 (1983), it has *never* been imposed as an absolute limit. For example, as noted by plaintiffs in their brief, the Supreme Court, in *Mahan v. Howell*, 410 U.S. 315, 328, 35 L. Ed. 2d 320, 332 (1973), held that a state *may* go to a higher range of deviation in creating legislative districts if its reason for doing so is based upon some rational neutral criteria. *See, e.g., Brown*, 462 U.S. at 842-43, 77 L. Ed. 2d at 221-22.

STEPHENSON v. BARTLETT

[355 N.C. 354 (2002)]

In complying with "one-person, one-vote" principles, the United States Supreme Court has stated that the burden is on the State to prove that population deviations among its various congressional districts are constitutionally acceptable. *See, e.g., Karcher v. Daggett,* 462 U.S. 725, 740, 77 L. Ed. 2d 133, 147 (1983). And while the State may not rely on general assertions, "[t]he showing required to justify population deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely." *Id.* at 741, 77 L. Ed. 2d at 147. The United States Supreme Court has also acknowledged that since congressional redistricting plans will be in effect for a minimum of ten years (as are North Carolina's legislative plans), "[s]ituations may arise where substantial population shifts over such a period can be anticipated." *Kirkpatrick v. Preisler,* 394 U.S. 526, 535, 22 L. Ed. 2d 519, 527 (1969). And "[w]here these shifts can be predicted with a high degree of accuracy, States that are redistricting may properly consider them," *id.,* so long as "[f]indings as to [such] population trends [are] thoroughly documented and applied throughout the State in a systematic, not an ad hoc, manner," *id.; see also White v. Weiser,* 412 U.S. 783, 37 L. Ed. 2d 335 (1973). Therefore, in applying these principles to redistricting plans for the North Carolina Senate and House of Representatives, districts could be drawn with higher or lower populations than is required under strict "one-person, one-vote" guidelines—as exemplified by the plus-or-minus-five-percent threshold now mandated by the majority—if criteria demonstrates that the projected population shifts can be predicted with a high degree of accuracy.

A recent newspaper article stated that Wake County was among county leaders in population growth rates. The county gained 27,796 residents in just fifteen months, while the State grew by 109,000 people. Ned Glascock, *Wake Leads Rapid Growth,* The News and Observer (Raleigh), Apr. 29, 2002, at B1. The article went on to state that several counties exceeded Wake's growth rate, with Union County experiencing the greatest growth rate (7.3%) of any county between 1 April 2000 and 1 July 2001. *Id.* Thus, should the General Assembly choose to consider growth patterns and to draw districts reflecting them, the majority opinion's plus-or-minus five percent mandate may well serve to preclude it from doing so. In my view, even the prospect of such a limitation is neither a necessary nor appropriate judicial imposition on the General Assembly, which in

practice is faced with the difficult task of drawing districts in compliance with a range of existing legal requirements.

Second, the majority, in the remedial portion of its opinion, also mandates that in "counties having a 2000 census population sufficient to support the formation of one non-VRA legislative district falling within plus or minus five percent deviation from the ideal population consistent with 'one-person, one-vote' requirements, the WCP requires that the physical boundaries of any such non-VRA legislative district not cross or traverse the exterior geographic line of any such county." The practical effect of this edict is to require the General Assembly to create a single-county, single-member district under the described circumstances. While that might be desirable, I conclude that mandating that the General Assembly do so likewise is neither necessary nor appropriate in the context of this case.

Third, again as part of the remedial section of its opinion, the majority uses a state equal protection argument based upon Article I, Section 19, to, in effect, hold portions of Article II, Sections 3(1) and 5(1) in violation of the State Constitution. While not precisely saying so, the majority holds that future use of multi-member districts is effectively struck down as unconstitutional. In concluding that the "use of *both* single-member and multi-member districts within the same redistricting plan violates the Equal Protection Clause of the State Constitution" (emphasis added), the majority plows new and unsettling ground. First, such a holding appears to hold one clause of the State Constitution as overruling another, in violation of a long-standing tenet of constitutional interpretation. *See Leandro v. State,* 346 N.C. 336, 352, 488 S.E.2d 249, 258 (1997) ("It is axiomatic that the terms or requirements of a constitution cannot be in violation of the same constitution—a constitution cannot violate itself."). Moreover, by stating that use of *both* single-member and multi-member districts is not constitutional, the majority at least implies that a plan using all multi-member districts could prove to be constitutional, a proposition that I question and one that the majority's own conclusion would appear to contradict.

Fourth, the use of our State Constitution's Equal Protection Clause to arguably strike down multi-member districts—when the United States Supreme Court has held to the contrary under the United States Constitution—marks one of those rare occasions where greater protection has been afforded under our State Constitution than under its federal counterpart. While acceptable to

do so, *see, e.g., State v. Carter*, 322 N.C. 709, 713, 370 S.E.2d 553, 555 (1988), I question whether this is the appropriate circumstance in which to do so.

Fifth, the majority places a caveat in its holding by stating that multi-member districts may be permitted if they are shown to advance "a compelling state interest." By then remanding the case to the trial court in order to allow evidence on whether a compelling state interest exists for *any* multi-member district, the majority potentially postpones a final resolution of this matter, which may well result in a protracted period of litigation.

Sixth, I question whether utilizing a State Constitution Equal Protection Clause argument in the remedial section is appropriate at all. No party raised such an issue at trial, nor did anyone argue such an issue to this Court. Likewise, no questions were propounded by this Court at oral argument contemplating such an issue. In this vein, I still agree with former Chief Justice Burley Mitchell, with whom I joined in a separate concurrence in *Nelson v. Freeland*: "I think it inadvisable to render an opinion of the magnitude of that entered by the majority in the case when, as here, . . . this Court has not had the benefit of briefs and arguments on the issued decided by the major- ity." 349 N.C. 615, 634, 507 S.E.2d 882, 893 (1998).

Seventh, and finally, in my view, the only remedial requirements that are compelled by this case are as follows:

(I) The General Assembly must first comply with the following mandatory criteria in drawing districts:

(1) United States constitutional requirements for "one person, one vote," with population variations within the districts being controlled by applicable federal case law;

(2) Voting Rights Act requirements;

(3) State constitutional requirements to the extent possible and not inconsistent with mandatory criteria specified in (1) and (2), above; such state requirements include:

(a) legislators shall be elected from single-member districts;

(b) counties shall not be divided in the formation of districts, except boundaries of areas within counties from which individ- ual members are elected may divide a single county internally or

cross a county line within a multi-county district to the minimal extent necessary.

(II) The General Assembly may also utilize nonmandatory criteria acknowledged by the federal courts as acceptable—i.e., community of interest, incumbent protection, and partisan considerations— so long as such use does not result in a violation of the mandatory criteria.

IV.

As to all other issues presented, including the justiciability issue raised by defendants, I would further take exception with footnote 10 of the majority opinion, which says that such other issues "do not need to be addressed in order to effect a full and proper resolution of this case." However, having reviewed those issues, I would conclude that they have no merit.

Thus, for the reasons set forth above, I concur in part with, and dissent in part from, the majority opinion.

Justice PARKER dissenting.

The sole issue before this Court is whether the trial court erred in ruling that the redistricting plans duly enacted by the General Assembly on 13 November 2001 and precleared by the United States Department of Justice on 11 February 2002 violate Article II, Sections 3(3) and 5(3) of the North Carolina Constitution ("State Constitution"). Defendants contend the trial court did err; I agree and vote to reverse.

Section 5 of the Voting Rights Act of 1965, as amended, prohibits "covered" jurisdictions from implementing or enforcing any changes to a "standard, practice, or procedure with respect to voting" unless those provisions have first been "precleared." 42 U.S.C. § 1973c (1994). Forty of North Carolina's one hundred counties are "covered" for purposes of section 5 preclearance requirements.

In 1966, North Carolina's legislative districts for the State House and Senate and the state constitutional provisions then governing the drawing of State House districts were held unconstitutional based on federal one-person, one-vote requirements. *Drum v. Seawell*, 249 F. Supp. 877 (M.D.N.C. 1965), *aff'd per curiam*, 383 U.S. 831, 16 L. Ed. 2d 298 (1966). In response the 1967 General Assembly enacted proposed constitutional amendments to redefine the manner

in which the General Assembly should proceed each decade to draw new legislative districts based on the decennial census. Those proposed amendments provided that "[n]o county shall be divided in the formation of a" House or Senate district. Act of May 31, 1967, ch. 640, secs. 1, 3, 1967 N.C. Sess. Laws 704, 704-05.[11] These amendments were submitted to the voters in 1968 on a ballot reading as follows: "FOR constitutional amendments continuing present system of representation in the General Assembly," and "AGAINST constitutional amendments continuing present system of representation in the General Assembly." *Id.* at secs. 7, 8, 1967 N.C. Sess. Laws at 706. At that time the State Constitution provided that each county would elect at least one member to the House of Representatives, N.C. Const. of 1868, art. II, § 5 (1962) (amended 1968), and mandated a ratio system to apportion the remaining Representatives, N.C. Const. of 1868, art. II, § 6 (1876) (amended 1968). With respect to the Senate the Constitution provided that the Senate would consist of fifty Senators, N.C. Const. of 1868, art. II, § 3, and that no county would be divided unless the county was equitably entitled to two or more Senators, N.C. Const. of 1868, art. II, § 4 (1876) (amended 1968). The amendments submitted to the people in 1968 also contained the provisions now found in Sections 3(1) and 5(1) of the 1971 State Constitution providing for one-person, one-vote and delineating the formula for determining how many Senators or Representatives a district would have. Ch. 640, secs. 1, 3, 1967 N.C. Sess. Laws at 704-05. These amendments were ratified by the voters and were carried over without substantive changes into the 1971 Constitution. *See* N.C. Const. art. II, §§ 3(1), 5(1).

The 1968 constitutional amendments were not initially submitted to the Department of Justice for preclearance under section 5 of the Voting Rights Act, nor were they precleared by virtue of litigation in the United States District Court for the District of Columbia. However, the 1971 Constitution was promptly submitted to, and precleared by, the United States Department of Justice after its ratification by the voters.

The prohibitions on dividing counties were followed in the 1971 and 1981 redrawing of state legislative districts. Late in 1981 an action was filed against state officials in their official capacity chal-

---

11. These amendments are embodied in two separate substantively identical provisions of our State Constitution. *See* N.C. Const. art. II, §§ 3(3), 5(3). However, for the sake of clarity, this dissent refers to these two provisions in the singular ("the provision").

lenging the legislative districts on the basis that the State had failed to obtain preclearance of the 1968 amendments precluding division of counties in the drawing of legislative districts. *Gingles v. Edmisten*, 590 F. Supp. 345, 350 (E.D.N.C. 1984) (three-judge court), *aff'd in part and reversed in part on other grounds*, 478 U.S. 30, 92 L. Ed. 2d 25 (1986). With this litigation pending, the State submitted the 1968 amendments seeking their preclearance from the Department of Justice. The General Assembly also amended the State House of Representatives plan while the preclearance request was pending and did not divide counties in the creation of the House districts. In submitting the 1968 amendments, the State presented the argument that the amendments did not constitute a change from the long-standing practice of drawing legislative districts without dividing counties.

Notwithstanding this argument the Department of Justice objected to the language against dividing counties and refused to give preclearance to the 1968 amendments or to redistricting plans enacted in reliance on those amendments, thereby forcing the General Assembly to redraw the legislative districts. The objection highlighted the Department's concern that application of the 1968 amendments would result in large, multi-member districts, which necessarily submerge minority voters into larger white voter districts. Pursuant to the Department of Justice's objection, the General Assembly drew new legislative plans that were precleared. However, these plans were still the subject of litigation under section 2 of the Voting Rights Act. *Gingles*, 590 F. Supp. at 351.

Once the General Assembly enacted new plans in 1982, State officials in their official capacity were the subject of a civil action brought by residents of Forsyth County to challenge the division of Forsyth County in the newly drawn legislative districts. Specifically, the plaintiffs claimed that the General Assembly could not divide Forsyth County because the county was not among the forty "covered" counties for purposes of section 5 preclearance. Hence, the constitutional provision still applied to the remaining noncovered counties. This claim was rejected by a three-judge United States District Court in *Cavanagh v. Brock*, 577 F. Supp. 176, 182 (E.D.N.C. 1983). The court in *Cavanagh* held that the denial of preclearance to the 1968 constitutional amendments meant that the amendments were not effective at all insofar as they prohibited the division of counties in the drawing of legislative districts. *Id.* at 181-82.

The 1982 legislative redistricting plans were used until the United States Supreme Court in *Gingles* required the General Assembly to modify them in order to carve out separate, majority-minority districts in certain counties of the State to comply with section 2 of the Voting Rights Act, which applies irrespective of whether a jurisdiction is covered under section 5. Section 2 compels states to create majority-minority districts when a minority population is sufficiently compact to form a majority in a single-member district and votes cohesively, but is generally unable to elect candidates of its choice because of the racial bloc voting of the majority, often in conjunction with other factors such as historical discriminatory practices that have affected the minority's ability to participate in the political process. *Gingles*, 478 U.S. at 50-51, 92 L. Ed. 2d at 46-47. The counties for which North Carolina was required to create section 2 districts under *Gingles* included Wake, Forsyth, and Mecklenburg, which are not "covered" counties under section 5, along with some section 5 counties. *Gingles*, 590 F. Supp. at 376, 384.

Thus, the plans used in the 1980s split a number of counties as did the plans enacted and used in the 1990s. The General Assembly proceeded on the basis that the only court decision that had ever considered the question of whether counties could be divided was binding on the General Assembly and that the 1968 constitutional amendments prohibiting the division of counties were of no force or effect. Against this background of litigation implementing the Voting Rights Act, the 2001 General Assembly enacted the Senate and House redistricting plans that are the subject of this civil action.

The following provisions of our State Constitution are determinative of this appeal.

Article II, Section 3 provides as follows:

The Senators shall be elected from districts. The General Assembly, at the first regular session convening after the return of every decennial census of population taken by order of Congress, shall revise the senate districts and the apportionment of Senators among those districts, subject to the following requirements:

(1) Each Senator shall represent, as nearly as may be, an equal number of inhabitants, the number of inhabitants that each

Senator represents being determined for this purpose by dividing the population of the district that he represents by the number of Senators apportioned to that district;

(2) Each senate district shall at all times consist of contiguous territory;

(3) No county shall be divided in the formation of a senate district;

(4) When established, the senate districts and the apportionment of Senators shall remain unaltered until the return of another decennial census of population taken by order of Congress.

N.C. Const. art. II, § 3.

Article II, Section 5 is identical except that it provides for "Representatives" rather than "Senators."

Article I, Section 3 provides as follows:

The people of this State have the inherent, sole, and exclusive right of regulating the internal government and police thereof, and of altering or abolishing their Constitution and form of government whenever it may be necessary to their safety and happiness; but every such right shall be exercised in pursuance of law and consistently with the Constitution of the United States.

N.C. Const. art. I, § 3.

Article I, Section 5 provides as follows:

Every citizen of this State owes paramount allegiance to the Constitution and government of the United States, and no law or ordinance of the State in contravention or subversion thereof can have any binding force.

N.C. Const. art. I, § 5.

In interpreting the State Constitution, we are guided by certain fundamental principles. The proper construction of our Constitution is generally controlled by the same principles that control in discerning the meaning of all written documents. *Perry v. Stancil*, 237 N.C.

442, 444, 75 S.E.2d 512, 514 (1953).[12] In searching for the will and intent of the people as expressed in the Constitution,

> all cognate provisions are to be brought into view in their entirety and so interpreted as to effectuate the manifest purposes of the instrument. The best way to ascertain the meaning of a word or sentence in the Constitution is to read it contextually and to compare it with other words and sentences with which it stands connected.

*State v. Emery*, 224 N.C. 581, 583, 31 S.E.2d 858, 860 (1944) (citations omitted). Further, where the meaning is clear from the words used in the Constitution, we will not search for meaning elsewhere; if the meaning is doubtful, the intention of the people must be sought. *Elliott v. State Bd. of Equalization*, 203 N.C. 749, 753, 166 S.E. 918, 921 (1932). Moreover, if given the choice of two possible interpretations of a state constitutional provision, one of which would violate the United States Constitution or federal law and one of which would not, this Court must interpret the provision consistently with federal law rather than invalidate the constitutional provision. *In re Arthur*, 291 N.C. 640, 642, 231 S.E.2d 614, 616 (1977) (noting with respect to statutory interpretation that "[w]here one of two reasonable constructions will raise a serious constitutional question, the construction which avoids this question should be adopted"). Finally, if it is not possible to interpret a state constitutional provision in a manner compliant with federal law, the state constitutional provision is void under the Supremacy Clause. *Constantian v. Anson Cty.*, 244 N.C. 221, 229, 93 S.E.2d 163, 168 (1956) (holding that "any provision of the Constitution or statutes of North Carolina in conflict [with federal law] must be deemed invalid").

In the present case the language in Article II, Sections 3(3) and 5(3) that "[n]o county shall be divided" is clear and unambiguous and is not subject to two reasonable interpretations. This language has been determined to be unenforceable under section 5 of the Voting Rights Act as to the forty counties covered by that section; hence, this provision is in conflict with federal law and, under the Supremacy Clause of the United States Constitution and the Supremacy Clause of the North Carolina Constitution, cannot be given force and effect in drafting legislative redistricting plans affecting those forty counties.

---

12. The constitutional provision in question in *Perry* has since been abrogated. *See Forsyth Mem'l Hosp., Inc. v. Chisholm*, 342 N.C. 616, 620, 467 S.E.2d 88, 90 (1996).

**STEPHENSON v. BARTLETT**

[355 N.C. 354 (2002)]

While this case does not fit the traditional application of the doctrine of severability, the concept of that doctrine does have an analogous application to this case. The doctrine provides that if a portion of a statute is invalid as violative of a constitutional provision or a federal law, the invalid portion may be stricken and the remaining portion given effect if it is whole and complete in itself and the intent of the legislature was such that the statute would have been enacted even without the stricken portion. *State ex rel. Andrews v. Chateau X, Inc.*, 296 N.C. 251, 259-60, 250 S.E.2d 603, 608 (1979), *judgment vacated on other grounds*, 445 U.S. 947, 63 L. Ed. 2d 782 (1980). In *Constantian* this Court stated:

> "A statute may be valid in part and invalid in part. If the parts are independent, or separable, but not otherwise, the invalid part may be rejected and the valid part may stand, provided it is complete in itself and capable of enforcement." 82 C.J.S., Statutes sec. 92. Our decisions are in accord. This well established rule applies equally when a portion of a state constitution or any provision thereof is invalid as violative of the Constitution of the United States.

*Constantian*, 244 N.C. at 228, 93 S.E.2d at 168 (citations omitted).

In this case, words of the State Constitution have not been determined to be invalid under federal law; rather, the constitutional provision has been rendered unenforceable in forty of the State's one hundred counties. Thus, by analogy, unless the provision can stand as a whole when applied in the remaining counties and this Court can determine that the intent of the people in ratifying the amendment was for the provision to have effect even if enforceable in less than all one hundred counties, the provision must fail.

The record in this case is devoid of any evidence suggesting that the amendments would have garnered the requisite three-fifths majority for a constitutional amendment in the legislature, N.C. Const. art. XIII, § 4, had the members of the General Assembly anticipated that the "no county shall be divided" provision would be applicable in less than all one hundred counties; nor does any evidence before the Court suggest that the people would have ratified the amendments with this limitation. Any conclusion to the contrary based on this record is pure speculation. As the three-judge United States District Court consisting of Judges J. Dickson Phillips; Franklin T. Dupree, Jr.; and W. Earl Britt noted, without preclearance the constitutional provision regarding division of counties is

not "effective as law" in the forty covered counties. With the [pro-vision's] effect thus territorially circumscribed by federal author-ity, under North Carolina law [it] would be effective in the sixty non-covered counties only if there were manifest a legislative, and popular, intent that the [provision] should be applied differ-entially across the state if for any reason—including a failure of section 5 preclearance—[it] should be held of no effect in respect of some portions of the state. We find no evidence of such an intent in any legislative source. The illogic, indeed the question-able legality, of such a consequence is manifest. We therefore conclude that the [provision was] necessarily intended by the leg-islature and the populace voting by referendum upon the legisla-tively proposed [provision] to rise or fall as a whole.

*Cavanagh*, 577 F. Supp. at 181-82.

Even if it is assumed that the intent of the people was as the majority espouses, the narrower question is whether, given the cov-ered counties limitation, the "no county shall be divided" provision of the State Constitution can be reconciled as written with other provi-sions of the State Constitution. The majority opinion leaves no doubt that this provision cannot be so reconciled.

The majority acknowledges that reconciliation is a fundamental goal of constitutional and statutory interpretation. However, the majority appears to read the language from *Sessions* that "[r]econcil-iation is a postulate of constitutional as well as of statutory con-struction," *Sessions v. Columbus Cty.*, 214 N.C. 634, 638, 200 S.E. 418, 420 (1939), to mean that if one provision of the State Constitution cannot, consistent with federal law, be reconciled with another pro-vision, then this Court is at liberty to rewrite one of the provisions or give the provision no effect. For example, the majority repeatedly qualifies the application of the "no county shall be divided" provision with words such as "whenever possible" or "to a large degree." The opinion states:

We recognize that . . . the right of the people of this State to leg-islative districts which do not divide counties is not absolute. In reality, an inflexible application of the WCP [whole-county provi-sion] is no longer attainable because of the operation of the pro-visions of the [Voting Rights Act] and the federal "one-person, one-vote" standard, as incorporated within the State Constitution.

(Citations omitted). Yet, the majority declares, "Where, as here, the primary purpose of the WCP can be effected to a large degree without conflict with federal law, it should be adhered to by the General Assembly to the maximum extent possible." This interpretation ignores the plain language of the "no county shall be divided" provision, which is clear and unambiguous. The majority cites no authority for this maximization theory, which, if applied as the majority mandates, is inconsistent with Article I, Section 3 of our State Constitution, providing that "[t]he people of this State have the inherent, sole, and exclusive right . . . of altering or abolishing their constitution." N.C. Const. art. I, § 3. While the majority notes that the Department of Justice's administrative guidelines "reflect that states need only modify, not necessarily abrogate, the application of whole-county redistricting limitations," the majority apparently fails to accept that, under the State Constitution, this Court has no authority to "modify" this provision.

The majority states that, "[w]ithout question, the intent of the WCP is to limit the General Assembly's ability to draw legislative districts without according county lines a reasonable measure of respect." However, the clear and unambiguous language of the "no county shall be divided" provision manifests that the intent is not "a reasonable measure of respect" for county lines; rather, the intent of this absolute mandate is that counties not be divided at all. Notwithstanding the majority's conclusory claims, the provision cannot be reasonably interpreted as evincing "the people's express wishes to contain legislative district boundaries within county lines whenever possible."

In rejecting defendants' argument that this construction "rewrites" the constitutional provision to read that "no county shall be divided except to the extent required by federal law," the majority states that "[d]efendants overlook the fact . . . that compliance with federal law is not an implied, but rather an express condition to the enforceability of *every* provision in the State Constitution." However, by proper operation of the Supremacy Clause, laws and provisions in conflict with federal law are rendered void. U.S. Const. art. VI, cl.2; *Constantian*, 244 N.C. at 229, 93 S.E.2d at 168. The Supremacy Clause does not merely modify the offending provision. While the majority is correct in noting that " '[s]everal provisions of our Constitution provide the elasticity which ensures the responsive operation of government' " (quoting *State ex rel. Martin v. Preston*, 325 N.C. 438, 458, 385 S.E.2d 473, 484 (1989)), the provision in question is clearly not one of the "several provisions" providing "elasticity."

Nowhere is the disregard for the plain language of the "no county shall be divided" provision more obvious than in its tortured application in the majority's remedial analysis. Under the guise of reconciling provisions of our State Constitution, the majority amends and rewords the "no county shall be divided" provision to permit division of counties so long as they are part of a multi-county grouping whose exterior boundaries are not crossed or traversed. How this approach is consistent with the language that "no county shall be divided" is not readily discernable. While this revision may be good policy and necessary to comply with the principle of one-person, one-vote while still maintaining a community of interest, this decision is one for the legislature or the people of this State, not for this Court.

Moreover, the majority's purported reconciliation of the State Equal Protection Clause with the language regarding multi-member districts misses the mark. Our State Equal Protection Clause states that "[n]o person shall be denied the equal protection of the laws." N.C. Const. art. I, § 19. Article II, Sections 3(1) and 5(1) state that

Each [Senator or Representative] shall represent, as nearly as may be, an equal number of inhabitants, the number of inhabitants that each [Senator or Representative] represents being determined for this purpose by dividing the population of the district that he represents by the number of [Senators or Representatives] apportioned to that district[.]

N.C. Const. art. II, § 3(1), 5(1). These provisions envision multi-member districts as valid in this State. Nevertheless, the majority purports. to reconcile the multi-member district language with the Equal Protection Clause by holding that the language on multi-member districts is "effective only within a limited context" and that, "while instructive as to how multi-member districts may be used compatibly with 'one-person, one-vote' principles, Article II, Sections 3(1) and 5(1) are not affirmative constitutional mandates."

The majority's "reconciliation" thus treats portions of Article II, Sections 3(1) and 5(1) as having no real effect, ignoring our long-standing rule of construction that a statute must be "construed, if possible, so that none of its provisions shall be rendered useless or redundant. It is presumed that the legislature intended each portion to be given full effect and did not intend any provision to be mere surplusage." *Porsh Builders, Inc. v. City of Winston-Salem*, 302 N.C. 550, 556, 276 S.E.2d 443, 447 (1981). This rule of statutory construction is equally applicable to constitutional construction. *See Perry*,

237 N.C. at 444, 75 S.E.2d at 514. Ignoring this rule of construction, the majority has determined that this language in our Constitution has no effect, but is merely instructive and is, therefore, surplusage that need not be followed. By refusing to give effect to this provision of our Constitution, the majority attempts to avoid the fundamental principle that one section of the North Carolina Constitution cannot violate another. *Leandro v. State*, 346 N.C. 336, 352, 488 S.E.2d 249, 258 (1997) ("It is axiomatic that the terms or requirements of a constitution cannot be in violation of the same constitution—a constitution cannot violate itself.").

A true reconciliation would necessarily treat multi-member districts as not violative of our State Equal Protection Clause, as those two clauses are co-equal. Such a construction gives effect to both provisions while respecting the rule that a state constitutional provision cannot violate the State Constitution. Rather than truly reconciling these provisions, the majority is forced by its determined preservation of the "no county shall be divided" provision to further amend the Constitution by making multi-member districts unconstitutional unless the General Assembly can show a compelling state interest in having multi-member districts. What exactly that compelling state interest might be is left for future litigation. The plain fact is that Article II, Sections 3(1) and 5(1) and Article II, Sections 3(3) and 5(3) cannot be reconciled with each other, consistent with federal law, without the use of multi-member districts or amendment of the "no county shall be divided" provision to allow multi-county groupings. Although limiting multi-member districts and allowing multi-county groupings may well be sound policy decisions, under the language of our State Constitution, this decision is again for the legislature or the people, not for this Court.

Finally, the redistricting scheme announced by the majority today creates four classes of citizens: (i) those who reside in covered counties and, therefore, may not enjoy the benefit of the "no county shall be divided" provision; (ii) those who reside in counties that do not receive the benefit of the provision in order to comply with section 2 of the Voting Rights Act; (iii) those who reside in noncovered counties and may or may not have the benefit of the provision, depending on whether their county needs to be divided to enable the forty covered counties to obtain preclearance; and (iv) those who reside in counties that receive the benefit of the provision and are kept whole (whether truly whole or whole as part of the new "multi-county groupings" allowed via the majority's amendment to the Constitu-

tion). Clearly, this disparate treatment of the citizenry was not the intention of the people who were accustomed to electing one Representative from each county when they declared that "[n]o county shall be divided in the formation of a senate or representative district." No other provision of the North Carolina Constitution that is by its terms applicable statewide has ever been interpreted by this or any other court as applying only in certain regions of the State. No proposition is more fundamental than that our State Constitution applies equally to all our people and applies uniformly throughout all one hundred counties.

Today, the majority amends our State Constitution to read:

No county shall be divided in the formation of legislative districts unless:

1. The county is covered by section 5 of the Voting Rights Act;

2. The county must be divided to comply with section 2 of the Voting Rights Act;

3. The county must be divided to enable a covered county to achieve preclearance; or

4. The county is part of a "multi-county grouping."

Sadly, in arriving at this proposal, the majority has lost sight of two cardinal principles of state constitutional construction. The first principle is:

"It is well settled in this State that the courts have the power, and it is their duty in proper cases, to declare an act of the General Assembly unconstitutional—*but it must be plainly and clearly the case. If there is any reasonable doubt, it will be resolved in favor of the lawful exercise of their powers by the representatives of the people.*"

*Preston*, 325 N.C. at 449, 385 S.E.2d at 478 (quoting *Glenn v. Board of Educ. of Mitchell Cty.*, 210 N.C. 525, 529-30, 187 S.E. 781, 784 (1936)) (emphasis added).

The second principle is:

If the provisions of [an Article of the State Constitution] are obsolete or ill-adapted to existing conditions, this Court is without power to devise a remedy. However liberally we may be inclined

to interpret the fundamental law, we should offend every canon of construction and transgress the limitations of our jurisdiction to review decisions upon matters of law or legal inference if we undertook to extend the function of the Court to a judicial amendment of the Constitution.

*Elliott*, 203 N.C. at 756, 166 S.E. at 922.

For the foregoing reasons, in my opinion Article II, Sections 3(3) and 5(3) are void and unenforceable. The guidelines mandated by the majority may provide a sound and wise basis for redistricting; however, this Court has, in my view, exceeded its constitutional authority by amending the State Constitution. Although I agree that the 2001 legislative plans duly enacted by the General Assembly are far from perfect, and are certainly not aesthetically appealing, the only question before this Court is whether those plans violate Article II, Sections 3(3) and 5(3) of our State Constitution. Accordingly, in adherence to the State Constitution, I must respectfully dissent.

Justice BUTTERFIELD dissenting.

I agree with Justice Parker's conclusion that the whole-county provisions of our state Constitution are void and unenforceable. I write separately to explain my view concerning the unenforceability of the whole-county provisions and to emphasize the important role of the Voting Rights Act in guaranteeing racial fairness in the political process.

The Fifteenth Amendment to the United States Constitution provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude," U.S. Const. amend. XV, § 1, and Congress has the power to enforce the Fifteenth Amendment by appropriate legislation, U.S. Const. amend. XV, § 2. In 1965, Congress, under the enforcement arm of the Fifteenth Amendment, enacted the Voting Rights Act, a landmark piece of civil rights legislation. The Voting Rights Act is designed to address legacies of racially polarized voting and discriminatory voting practices that have not vanished.

Section 2 of the Voting Rights Act covers all states and all political subdivisions within the states. It provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a

manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a) (1994). In the simplest terms, section 2 concerns the vote dilution of a protected class. Section 5 of the Voting Rights Act, which covers some states in their entirety and covers selected jurisdictions in other states, such as in North Carolina, applies when a covered jurisdiction "shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure."[13] 42 U.S.C. § 1973c (1994). Also stated simply, section 5 seeks to prevent "retrogression" of minority voting strength.

In 1982, United States Senator Patrick Leahy observed the following during a Senate hearing on amending the Voting Rights Act:

If section 5 is the engine that drives the act and renders it enforceable as a practical matter, section 2 is still the basic protection against discriminatory practices. Preclearance does not cover all areas and may not resolve every threatened violation where it does apply. Preclearance is designed to stop voting discrimination before it can start in covered jurisdictions, and section 2 is calculated to end it whenever and wherever it is found.

*2 Voting Rights Act: Hearings on S. 53, S. 1761, S. 1975, S. 1992, and H.R. 3112 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary*, 97th Cong. 45 (1982) (statement of Sen. Leahy, Member, Senate Comm. on the Judiciary).

In 1967, the North Carolina General Assembly sought to amend the Constitution of North Carolina. The amendments included provisions prohibiting the dividing of counties in the redistricting process. The proposed constitutional amendments were placed on the ballot in 1968 and passed by an ample margin. The proposition on the ballot stated simply, "FOR constitutional amendments continuing present system of representation in the General Assembly," and "AGAINST constitutional amendments continuing present system of representation in the General Assembly." Act of May 31, 1967, ch. 640, sec. 8,

---

13. North Carolina has forty covered jurisdictions: Anson, Beaufort, Bertie, Bladen, Camden, Caswell, Chowan, Cleveland, Craven, Cumberland, Edgecombe, Franklin, Gaston, Gates, Granville, Greene, Guilford, Halifax, Harnett, Hertford, Hoke, Jackson, Lee, Lenoir, Martin, Nash, Northampton, Onslow, Pasquotank, Perquimans, Person, Pitt, Robeson, Rockingham, Scotland, Union, Vance, Washington, Wayne, and Wilson Counties.

1967 N.C. Sess. Laws 704, 706. The proposition did not expressly indicate that whole-county provisions were being adopted.

Upon adoption of the amendments by the voters in 1968, the State of North Carolina did not submit the constitutional amendments to the District of Columbia District Court or to the United States Department of Justice as required by section 5 of the Voting Rights Act. When the amendments were subsequently included in the 1971 Constitution, the State sought preclearance of the entire Constitution through the Attorney General but did not specifically identify the provisions relating to voting as required by section 5 administrative guidelines.

The nonprecleared whole-county provisions were enforced in the 1971 redistricting process with no divided counties. In 1981, the State again attempted to enforce the whole-county provisions. However, the United States Attorney General objected to the submitted plans and discovered the nonprecleared 1968 amendments. Upon discovery, the amendments were submitted for preclearance. The Attorney General refused to preclear the amendments and, under power vested to him by section 5 of the Voting Rights Act, interposed an objection to the use of the 1968 amendments in the forty covered counties. The effect of the Attorney General's objection was to give the General Assembly the discretion to divide those forty counties covered by section 5 of the Voting Rights Act.

Following the objection in 1982, the General Assembly concluded that the Attorney General's refusal to preclear the amendments rendered the whole-county provisions completely unenforceable, thereby granting the General Assembly the discretion to divide counties statewide. The General Assembly thereafter exercised this discretion and divided counties outside the forty covered jurisdictions.

The 1982 redistricting plans were challenged in 1982 on the basis of an alleged violation of the whole-county provisions. The case was removed to federal court, and the State's position that the whole-county provisions were unenforceable was upheld by three federal judges from North Carolina, Judges J. Dickson Phillips; Franklin T. Dupree, Jr.; and W. Earl Britt. *Cavanagh v. Brock*, 577 F. Supp. 176 (E.D.N.C. 1983). The United States Supreme Court subsequently struck down the 1982 plans as violative of section 2. *Thornburg v. Gingles*, 478 U.S. 30, 92 L. Ed. 2d 25 (1986). All redistricting plans

since *Gingles* have divided counties outside of the forty covered counties.

In administrative preclearance proceedings, the United States Attorney General is a surrogate for the District of Columbia District Court. No new voting practice is enforceable unless the covered jurisdiction has succeeded in obtaining preclearance. 42 U.S.C. § 1973c. Voting changes to which the United States Attorney General has interposed an objection are legally unenforceable.

Unquestionably, the United States Attorney General's objection rendered the whole-county provisions void and unenforceable in the forty covered counties. The Supremacy Clauses of the United States and North Carolina Constitutions prohibit the enforcement of the whole-county provisions in the forty covered counties. U.S. Const. art. VI, cl. 2; N.C. Const. art. I, § 3. The question then becomes whether the provisions are invalidated as to all counties or are capable of partial enforcement in the remaining noncovered counties.

"One of the first rules in construing constitutions, and it applies to all written instruments, is to ascertain the intention of the people in adopting it." *Reade v. City of Durham*, 173 N.C. 668, 677, 92 S.E. 712, 715 (1917). "Constitutional provisions should be construed in consonance with the objects and purposes in contemplation at the time of their adoption. To ascertain the intent of those by whom the language was used, we must consider the conditions as they then existed and the purpose sought to be accomplished." *Perry v. Stancil*, 237 N.C. 442, 444, 75 S.E.2d 512, 514 (1953).

The majority states that its holding "accords the fullest effect possible to the stated intentions of the people." The majority offers no insight as to how it divined the intent of the people. My view of the people's intent does not include the sacred nostalgia for whole counties that the majority seems to embrace.

It is important to mention that voting discrimination in 1968 was especially significant and that African-American citizens were subjected to practices and procedures that affected their right to register to vote and to be able to elect legislators of their choice. Accordingly, there were no African-American members in the General Assembly when the amendments were adopted. The electorate in 1968 failed to include many African-American citizens who were eligible to register to vote but were not registered because of reasons attributable to their race. In other words, voting discrimination, which the Voting

Rights Act seeks to eliminate, was present in the enactment and adoption of the amendments under review. Therefore, I am unable to conclude that the amendments represented the will of *all* of the people when the General Assembly passed them and the voters adopted them.

A historical evaluation sheds some light on the purpose of the 1968 amendments. The majority sets out the basic path of how the whole-county provisions came to . be incorporated into the Constitution of North Carolina. There are several points that I believe the majority omits in its discussion that are relevant to my reasoning. First, until the 1968 amendments that put in place the whole-county provisions, there was no express prohibition in the Constitution against the division of counties in the creation of House districts. Rather, the constitutional mandate requiring at least one Representative for each county meant that no county was, in practice, ever divided. This is a subtle but important distinction.

Prior to *Drum v. Seawell*, 249 F. Supp. 877 (M.D.N.C. 1965), *aff'd per curiam*, 383 U.S. 831, 16 L. Ed. 2d 298 (1966), under the constitutional requirement that each county have at least one Representative, House districts were never divided. *See* John L. Sanders, *Maps of North Carolina Congressional Districts, 1789-1960, and of State Senatorial Districts and Apportionment of State Representatives, 1776-1960* (Inst. of Gov't, Univ. of N.C. at Chapel Hill, 1961); John L. Sanders, *Materials on Representation in the General Assembly of North Carolina* (Inst. of Gov't, Univ. of N.C. at Chapel Hill, 1965). After *Drum* and the adoption of the 1968 amendments, no county was divided in the creation of a House or Senate district, until 1982, as a result of the constitutional prohibitions against dividing counties. *See* Act of Jan. 13, 1966, ch. 1, 1965 N.C. Sess. Laws (Extra Sess. 1966) 13; Act of Jan. 14, 1966, ch. 5, 1965 N.C. Sess. Laws (Extra Sess. 1966) 17; Act of June 1, 1971, ch. 483, 1971 N.C. Sess. Laws 412; Act of July 21, 1971, ch. 1177, 1971 N.C. Sess. Laws 1743. It is true that there was a prohibition in the 1868 Constitution on the division of counties for some Senate districts. That provision prohibited the division of counties in the creation of a Senate district unless that district was entitled to two or more Senators. Therefore, the express prohibition against dividing counties for Senate districts never affected all of the counties simultaneously in its application.

The majority states, "The proposed amendments for the Senate and House of Representatives reincorporated a prohibition against

the division of counties." The only prohibition that was "reincorporated" in the amendments was for the Senate. After the adoption of the 1968 amendments, Article II, Section 5(3) of the Constitution of North Carolina created a prohibition that did not previously exist against the division of counties in the creation of House districts. The requirement that every county have at least one Representative was stricken from the Constitution when the 1968 amendments were adopted. The Constitution of 1971 made no changes to the whole-county provisions, and those provisions remain in the form adopted in 1968.

The majority acknowledges that *Drum* was the catalyst for the 1968 amendments. The majority states that *Drum* held that the "legislative redistricting plans violated the 'one-person, one-vote' requirement of the United States Constitution and were therefore void." In order to divine the intent of the people, one must understand what was at issue in *Drum* and the effect of the *Drum* decision on the Constitution.

A full understanding of *Drum* cannot be achieved without understanding the distinction between redistricting and reapportionment. Each of these terms has a precise meaning that invokes different aspects of law. In modern parlance, the two terms have tended to be used haphazardly and, sometimes, interchangeably. Reapportionment is the reallocation of legislators among existing political subdivisions. Redistricting is the actual redrawing of existing district lines. *See Department of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 142 L. Ed. 2d 797 (1999) (discussing role of decennial census in both reapportionment and redistricting).

When *Drum* was written, the House had 120 members and the Senate had 50, just as they do today. The one hundred counties accounted for one hundred Representatives. The remaining twenty Representatives were allotted to the more populous counties. The questions before the General Assembly were the same then as now: How many districts would there be?, How many members would be in each district?, and Where would the boundaries of those districts be located? *Drum* was instituted to challenge the manner in which the General Assembly apportioned House members to districts. The court in *Drum* held that the manner of apportionment violated the federal requirements established in *Reynolds v. Sims*, 377 U.S. 533, 12 L. Ed. 2d 506 (1964) (establishing the principle of "one-person, one-vote"). Under the federal standards, the General Assembly could no longer legally comply with the constitutional requirement that

every county have at least one Representative. The constitutional requirement was unenforceable after *Drum*. The lawsuit in *Drum* was brought because of the manner of reapportionment, not because of redistricting. This bears directly on the 1968 amendments.

If one operates from the presumption that the 1968 amendments were in response to *Drum*, then such a presumption would seem to weaken, rather than support, the majority's argument concerning intent. Contemporary reports by those involved in complying with *Drum* bolster this presumption. Then Governor Daniel K. Moore addressed a special legislative session convened after the November 1965 decision in *Drum* as follows:

> Ladies and gentlemen, the hour of decision has arrived. The General Assembly of North Carolina must meet head on the mandate of the Supreme Court of the United States and reapportion both houses and congressional districts in accordance with the "one man, one vote" decision enunciated by the Supreme Court. The General Assembly must make these decisions in compliance with the specific orders of the United States District Court for the Middle District of North Carolina issued on November 30, 1965.

Message to the Extra Session of the General Assembly (Jan. 10, 1966), *in Messages, Addresses, and Public Papers of Daniel Killian Moore, Governor of North Carolina, 1965-1969*, 65, at 69 (Memory F. Mitchell ed. 1971). In *Reynolds*, the United States Supreme Court established the requirement of substantially equal representation for all citizens in a state. The Court stated, "With respect to the allocation of legislative representation, all voters, as citizens of a State, stand in the same relation regardless of where they live." *Reynolds*, 377 U.S. at 565, 12 L. Ed. 2d at 529. If there was an absolute necessity for amending the Constitution, I believe it arose from the problems created by the constitutional requirement to have at least one Representative per county.

This Court has previously examined the effect of federal court decisions on the Constitution of North Carolina. The severance analysis applicable to statutes, determining whether one portion of the statute can survive after another portion of the statute has been stricken, is equally applicable to constitutional provisions. *Constantian v. Anson Cty.*, 244 N.C. 221, 228, 93 S.E.2d 163, 168 (1956). The two-part severability test was set out in *State ex rel. Andrews v. Chateau X, Inc.*, 296 N.C. 251, 259, 250 S.E.2d 603, 608

(1979), *judgment vacated on other grounds*, 445 U.S. 947, 63 L. Ed. 2d 782 (1980), as follows:

> To determine whether the portions [of a statute] are in fact divisible, the courts first see if the portions remaining are capable of being enforced on their own. They also look to legislative intent, particularly to determine whether that body would have enacted the valid provisions if the invalid ones were omitted.

Applying this statutory analysis to the whole-county provisions, I believe that if Article II, Sections 3(3) and 5(3) are severed from the remaining clauses of the 1968 constitutional amendments, then the remaining clauses—concerning equal representation, contiguity, and unaltered districts and apportionment between congressional censuses—are capable of being enforced on their own. As previously expressed, I believe that the principal legislative intent of the 1968 amendments was to comply with *Drum* and the federal "one-person, one-vote" requirement. I believe that the 1967 General Assembly would have voted to submit amendments to the voters without the whole-county provisions in order to comply with *Drum* and that the whole-county provisions were not vital to the paramount intent of the amendments.

The whole-county provisions were, as the court in *Cavanagh* stated, "to rise or fall as a whole." *Cavanagh*, 577 F. Supp. at 182. We are faced with the combination of the impediments placed on the reapportionment and redistricting processes by the supremacy of section 5 of the Voting Rights Act, the requirements under section 2 that must be applied across the entire state, and the "one-person, one-vote" requirement.

When taken in the aggregate, I believe these requirements overwhelm the whole-county provisions to the extent that they are functionally unworkable in any manner that would give them purposeful effect, considering *Drum* and the demographics of the 1968 electorate, and that they are, therefore, unenforceable. My determination that the whole-county provisions are unenforceable logically makes moot further examination of our state Constitution on the issue of the constitutional propriety of multi-member and single-member districts that the majority undertook in fashioning its remedy.

While I feel very strongly that the whole-county provisions of the state Constitution are void and unenforceable, I am compelled to

**STEPHENSON v. BARTLETT**

[355 N.C. 354 (2002)]

comment upon the majority's remedy. The majority has crafted a remedy that it believes gives maximum enforcement to the whole-county provisions. In my view, the majority has assumed to act in a legislative, rather than a judicial, capacity in its approach to a remedy. This Court has stated:

> When called upon to exercise its inherent constitutional power to fashion a common law remedy for a violation of a particular constitutional right, . . . the judiciary must recognize two critical limitations. First, it must bow to established claims and remedies where these provide an alternative to the extraordinary exercise of its inherent constitutional power. *In re Alamance County Court Facilities*, 329 N.C. 84, 100-01, 405 S.E.2d 125, 133 (1991) (discussing and applying inherent powers of the judiciary). Second, in exercising that power, the judiciary must minimize the encroachment upon other branches of government—in appearance and in fact—by seeking the least intrusive remedy available and necessary to right the wrong. *Id.*

*Corum v. University of N.C.*, 330 N.C. 761, 784, 413 S.E.2d 276, 291, *cert. denied*, 506 U.S. 985, 121 L. Ed. 2d 431 (1992).

The criteria directed by the majority, while similar to criteria utilized by the judiciary in court-ordered remedies, are an encroachment upon the discretion of the Legislative Branch of government. Our General Assembly is fully capable of interpreting the decision of this Court without having its discretionary legislative authority bound by the Judicial Branch of government. I believe that the majority's approach to the remedy is excessive in its reach.

In sum, I believe that the whole-county provisions of our state Constitution are void and completely unenforceable, and I believe that the General Assembly was correct in determining that the whole-county provisions were unenforceable statewide. Accordingly, I would vote to uphold the 2001 redistricting plans enacted by the General Assembly. Therefore, I must respectfully dissent.